Argued and submitted September 3, 1981, reversed and remanded
May 3, appellants' and respondent's reconsiderations denied June 10,
both petitions for review denied August 3, 1982 (293 Or 456)

CHRISTOFFERSON,
*Respondent,*

*v.*

CHURCH OF SCIENTOLOGY
OF PORTLAND et al,
*Appellants.*

(No. A7704-05184, CA 15952)

644 P2d 577

Charles J. Merten, Portland, and Emily M. Bass, New York, New York, argued the cause for appellants. On the briefs was Charles J. Merten, Portland.

Garry P. McMurry, Portland, argued the cause for respondent. With him on the brief were Patric J. Doherty, Ronald L. Wade, Rankin, McMurry, VavRosky & Doherty, William T. Powers and Powers & Powers, Portland.

Elden M. Rosenthal and Leslie M. Roberts, Portland, filed a brief amicus curiae for Cooperating Counsel for the American Civil Liberties Union of Oregon.

James K. Hoops, Lee Boothby, and Robert W. Nixon, Portland, filed a brief amicus curiae for Americans United for Separation of Church and State.

Before Gillette, Presiding Judge, Young, Judge, and Roberts, Judge Pro Tempore.

GILLETTE, P. J.

## GILLETTE, P. J.

Defendants appeal from the judgment entered on a jury verdict in favor of plaintiff in her action for fraud and intentional infliction of emotional distress ("outrageous conduct").[1] Plaintiff's fraud cause of action alleged 14 misrepresentations which induced her to pay some $3,000 to defendants. Her cause of action for outrageous conduct alleged in two counts a scheme to gain control of her mind and to force her into a life of service to defendants and a course of retaliatory conduct after plaintiff disassociated herself from defendants. Defendants interposed various defenses, including a defense based upon the Free Exercise Clause of the First Amendment. The jury awarded compensatory and punitive damages. We reverse and remand.

### THE PARTIES AND THE FACTUAL BACKGROUND

Plaintiff is a young woman who moved to Portland from Eureka, Montana, in July, 1975, shortly after she graduated from high school, intending to obtain some work experience before going to college in the fall to study civil engineering. When she first arrived, she stayed for a few days with a friend from Montana, Pat Osler, and then moved into an apartment with a young woman she met through Osler. She soon found a job with an engineering firm and worked there full-time.

Defendants are the Church of Scientology of Portland (COSOP), a religious corporation; the Church of Scientology, Mission of Davis (the Mission), also a religious corporation; the Delphian Foundation (Delphian), a nonprofit educational institution not expressly organized as a church-related school; and Martin Samuels, an ordained minister of the Church of Scientology and the president of the Mission and Delphian.

The beliefs of Scientology were summarized in *Founding Church of Scientology v. United States,* 409 F2d 1146, 1151-52, (DC Cir 1969), in a manner which appears to be accurate according to the record before us in this case:

---

[1] Plaintiff's complaint also contained a cause of action for Unlawful Trade Practices against all defendants. The jury found that the action was barred by the statute of limitations as to all defendants except the Church of Scientology of Portland. As to the Church, it awarded no damages on that claim, and we are not asked to review that verdict.

"The movement apparently rests almost entirely upon the writings of one man, L. Ron Hubbard, an American who maintained the headquarters of the movement in England at the time this action was brought. In the early 1950's, Hubbard wrote tracts elucidating what he called 'Dianetics.' Dianetics is a theory of the mind which sets out many of the therapeutic techniques now used by Scientologists, * * *.

"The basic theory of Dianetics is that man possesses both a reactive mind and an analytic mind. The analytic mind is a superior computer, incapable of error, to which can be attributed none of the human misjudgments which create social problems and much individual suffering. These are traceable rather to the reactive mind, which is made up of 'engrams,' or patterns imprinted on the nervous system in moments of pain, stress or unconsciousness. These imprinted patterns may be triggered by stimuli associated with the original imprinting, and may then produce unconscious or conditioned behavior which is harmful or irrational.

"Dianetics is not presented as a simple description of the mind, but as a practical science which can cure many of the ills of man. It terms the ordinary person, encumbered by the 'engrams' of his reactive mind, as a 'preclear,' by analogy to a computer from which previously programmed instructions have not been erased. The goal of Dianetics is to make persons 'clear,' thus freeing the rational and infallible analytical mind. The benefits this will bring are set out in considerable and alluring detail. All mental disorders are said to be caused by 'engrams,' as are all psychosomatic disorders, and that concept is broadly defined.

"A process of working toward 'clear' is described as 'auditing.' This process was explicitly characterized as 'therapy' in Hubbard's best-selling book *DIANETICS: THE MODERN SCIENCE OF MENTAL HEALTH* (1950). The process involves conversation with an 'auditor' who would lead the subject or 'preclear' along his 'time track,' discovering and exposing 'engrams' along the way. Though auditing is represented primarily as a method of improving the spiritual condition of man, rather explicit benefits to bodily health are promised as well. Hubbard has asserted that arthritis, dermatitis, asthma, some coronary difficulties, eye trouble, bursitis, ulcers and sinusitis are psychosomatic and can be cured, and further that tuberculosis is 'perpetuated by engrams.'
"* * * * *

"The Hubbard Electrometer, or E-meter, plays an essential, or at least important, part in the process of auditing. The E-meter is a skin galvanometer, similar to those used in giving lie detector tests. The subject or 'preclear' holds in his hands two tin soup cans, which are linked to the electrical apparatus. A needle on the apparatus registers changes in the electrical resistance of the subject's skin. The auditor asks questions of the subject, and the movement of the needle is apparently used as a check of the emotional reaction to the questions. According to complex rules and procedures set out in Scientology publications, the auditor can interpret the movements of the needle after certain prescribed questions are asked, and use them in diagnosing the mental and spiritual condition of the subject." (Footnotes omitted).

From Dianetics developed Scientology, which incorporates Dianetics, but includes broader concepts. As characterized in *Founding Church, supra:*

"With Scientology came much of the overlay which lends color to the characterization of the movement as a religious one. Hubbard has claimed kinship between his theories and those espoused by Eastern religions, especially Hinduism and Buddhism. He argues that man is essentially a free and immortal spirit (a 'thetan' in Scientological terminology) which merely inhabits the 'mest body' ('mest' is an acronym of the words matter, energy, space, time). Man is said to be characterized by the qualities of 'beingness,' 'havingness,' and 'doingness.' The philosophical theory was developed that the world is constructed on the relationships of 'Affinity,' 'Reality' and 'Communication,' which taken together are denominated 'the ARC Triangle.' " 409 F2d at 1152. (Footnotes omitted).

The thetan is said by Hubbard to be immortal; it is the spirit controlling the body, through the mind. After the death of the body, the thetan "exteriorizes" and returns in another body. The thetan does not care to remember the life just lived when separated from the body and mind, but because each individual comes back, he is responsible for what goes on today because he will experience it tomorrow.

Plaintiff became involved with Scientology[2] almost immediately upon arriving in Portland. Her friend Osler

---

[2] References to "Scientology" refer to plaintiff's involvement with the movement in general and do not refer to plaintiff's relationship with any particular defendant.

was taking courses from the Mission and, on his advice, she enrolled in a communications course offered by the Mission. As part of the enrollment process, she also applied for membership in the Church of Scientology. Because she was not yet 18 years old, she was told that she must obtain her mother's consent to receive the services offered by the Mission. She telephoned her mother and dictated a consent form which her mother typed, signed and returned.

Plaintiff paid $50 for the communications course and began attending classes at the Mission every evening after work and at least one day on the weekends. Before completing the communications course, she signed up for another course and continued to participate in courses and services offered at the Mission until the beginning of October, 1975.

In early September, plaintiff applied to become a provisional staff member at Delphian, located at Sheridan, Oregon. She informed her parents that she had decided not to attend college that fall. Moving to Delphian in early October, she worked as a provisional staff member until the beginning of December. At that time, she was asked to leave Delphian until she could convince her mother to stop opposing her involvement in Scientology. Plaintiff moved from Sheridan back to Portland and worked as a waitress. While there, she worked with a staff member of the Mission, attempting to convince her parents not to interfere with Scientology.

Plaintiff went home for Christmas and then returned to Portland in the early part of January, 1976. She lived with several people, mainly Scientologists, and continued to work as a waitress. She did not participate in courses or programs at the Mission, but continued to work on "handling" her parents. In April, 1976, plaintiff went to her parents' home in Montana to "handle" them, that is, to convince them to accept her involvement in Scientology, or else to "disconnect" from them. When she reached home, she was locked in the house and "deprogrammed." She did not return to her involvement with Scientology and, in fact, became active in anti-Scientology activities and participated in "deprogramming" others. She filed this action in 1977.

Defendants raise 52 assignments of error, covering nearly every phase of the proceedings from pretrial to post-verdict. Organization of the issues is somewhat complicated by the various causes of action and the various defendants. Several assignments involve the First Amendment defense raised by defendants. However, before reaching the constitutional issues which must be decided in this case, we first consider non-constitutional challenges to the outrageous conduct cause of action.

## OUTRAGEOUS CONDUCT

Plaintiff alleged two counts of outrageous conduct. The first alleged a scheme to gain control of her mind and to force her into a life of service to defendants. The allegations in this count involve actions committed by defendants during the time that plaintiff was involved with Scientology. At the close of the case, defendants moved for directed verdicts on this cause of action, arguing that, as a matter of law, plaintiff had not proved acts that exceeded the limits of social toleration.[3]

The tort of intentional infliction of emotional distress, or outrageous conduct, is still in the process of developing in this state. For example, there remain some questions as to what state of mind is required in particular situations to subject a defendant to liability. *See Brewer v. Erwin*, 287 Or 435, 454-58, 600 P2d 398 (1979); *compare Turman v. Central Billing Bureau*, 279 Or 443, 568 P2d 1382 (1977), *with Rockhill v. Pollard*, 259 Or 54, 485 P2d 28 (1971).

A "special relationship" between the parties has played a role in every case in this state involving this tort.[4]

---

[3] The motion below was directed to both counts of the outrageous conduct claim. On appeal, defendants argue that there was no outrageous conduct as a matter of law as to Count II. As to Count I, defendants do not make that precise argument, but make several other arguments, including the argument that the actions are protected by the First Amendment. We decide the issue as to both counts on the non-constitutional basis rather than reach the constitutional issue as to Count I.

[4] *Brewer* specifically did not decide whether there could be recovery in a situation in which there was no special relationship and where only recklessness was shown. One of defendants' assignments of error concerns an instruction which informed the jury that plaintiff could recover if defendants acted recklessly. Plaintiff had previously withdrawn portions of her complaint which alleged a special relationship between her and defendants. We do not reach the issue of the instruction because we dispose of the outrageous conduct claims on other grounds.

The tort was characterized in *Turman v. Central Billing Bureau, supra,* as " "* * * an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests. * * *.' " 279 Or at 446. *See also Brewer v. Erwin, supra* (landlord and tenant); *Rockhill v. Pollard, supra* (doctor and patient); *Fitzpatrick v. Robbins,* 51 Or App 597, 626 P2d 910, *rev den* 291 Or 151 (1981) (landlord and tenant); *Bodewig v. K-Mart,* 54 Or App 480, 635 P2d 657 (1981), *rev den* 292 Or 450 (1982) (employer-employe).[5] The role of that relationship has recently been explored in *Hall v. May Department Stores Co.,* 292 Or 131, 637 P2d 126 (1981), a case involving an employer-employe relationship, in which the court stated:

> "The character of the relationship bears on the mental element required to impose liability, *compare Rockhill* with *Turman* and *Brewer,* and also on the next issue, the offensiveness of conduct that crosses the threshold of potential liability, *see Pakos v. Clark,* [253 Or 113, 453 P2d 682 (1969)]." 292 Or at 137.

A plaintiff's particular susceptibility to distress has also played a part in certain of the cases. *See Rockhill v. Pollard, supra* (plaintiff already distraught because of automobile accident and injury to child); *Turman v. Central Billing Bureau, supra* (plaintiff blind and suffering from glaucoma, requiring treatment by clinic for which bill was being collected); *Fitzpatrick v. Robbins, supra* (plaintiffs aged and visually disabled).

Part of the uniqueness of this case lies in the absence of both of the considerations just discussed. At the close of the evidence, plaintiff withdrew the portion of her complaint which alleged a special relationship between her and defendants. Neither does she argue on appeal that she was in any way particularly susceptible to the infliction of emotional distress.[6]

---

[5] *Bodewig* involved one party defendant who had no special relationship to the plaintiff. However, even in that case, some of the acts necessary to establish the tort were committed only by the employer-defendant, *albeit* with the other party defendant's encouragement.

[6] Plaintiff was 17 years old when she first enrolled in the communications course but turned 18 soon after. She does not contend that her age or the fact that she was living on her own for the first time made her particularly susceptible to the infliction of emotional distress.

The type of conduct for which liability may be imposed for infliction of emotional distress, absent physical injury, is not well defined. *Rockhill v. Pollard, supra,* rejected the description in Restatement (Second) of Torts, § 46 (1965)[7] and decided:

> "We need a simpler test and think it best for this case to merely hold that the conduct must be outrageous in the extreme. It is our impression that the test for liability in these cases can only be worked out on a case by case basis. Here we must determine whether defendant's conduct was so extreme as to warrant the imposition of liability for any severe emotional distress caused thereby." 259 Or at 59-60.

In later cases, the type of conduct which would subject a defendant to liability has been characterized as "beyond the limits of social toleration." *Brewer v. Erwin, supra,* 287 Or at 458; *see also, Hall v. May Department Stores Co., supra,* 292 Or at 137.

■ Although it is ordinarily for the trier of fact to determine not only the historical facts, but also "whether the offensiveness of the defendant's conduct exceeds any reasonable limit of social toleration," *Hall v. May Department Stores Co., supra,* 292 Or at 137,

> "[i]t [is] for the trial court to determine, in the first instance, whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. If the minds of reasonable men would not differ on the subject the court [is] obliged to grant an order of involuntary nonsuit * * *." *Pakos v. Clark, supra,* 253 Or at 132.

---

[7] The Restatement describes the conduct which gives rise to liability as follows:

"* * * It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Restatement (Second) of Torts, § 46, comment d (1965), quoted in *Rockhill v. Pollard, supra,* 259 Or at 59-60.

The trial court here erred in denying defendants' motions for a directed verdict as to Count I of the outrageous conduct cause of action. We find no conduct both alleged and proved under that count that could subject defendants to liability for the tort. Plaintiff's first count alleges:

"That the above misrepresentations and other unlawful practices were part of a scheme to gain control of Plaintiff's mind and force her into a life of service to the Defendants. She was intentionally alienated from her family and friends. Plaintiff's ability to direct her life and form reasonable judgments was intentionally impaired by Defendants through the use of a crude polygraph, intense peer pressure and other covert means. She was coerced into performing labor for which she was not paid. She was held up to ridicule, humiliated, and forced under threat of retribution and physical harm to follow the dictates of the Defendants, and caused to give Defendants all the monies she had or could beg or borrow from others.

"As part of the above scheme, Defendants caused Plaintiff to believe and fear that she would be subject to severe punishment should she ever bring suit against Defendants, voice her disapproval of Defendants' practices, testify against Defendants, demand a return of money from Defendants or commit any other act Defendants determined to be against their interests."

■ In this pleading, defendants' intent, their conduct and the effect on plaintiff are interwoven. However, this interweaving should not be permitted to obscure the fact that each of the three elements—intent, conduct which is outrageous or beyond the limits of social toleration, and resultant severe emotional distress—must be proved. In the present case, defendants made no argument concerning intent, but they maintain that there is not sufficient evidence of either of the last two elements—the outrageous conduct and the resultant distress—to permit the case to go to a jury. We agree that there is no sufficient evidence of the resultant severe emotional distress. However, that specific basis for taking the case from the jury was not argued to the trial court and we therefore decline to reverse the court on that basis. This brings us to a consideration of the evidence concerning defendants' conduct. It is only by proof of conduct that is "beyond the limits of social toleration" that plaintiff may recover in an action for outrageous

conduct, no matter what defendants may have intended and no matter what the effect on plaintiff may have been.[8]

With respect to the well-pleaded allegations, the evidence, viewed in the light most favorable to plaintiff, is as follows. Plaintiff enrolled in the communications course on the advice of her friend Pat Osler. She paid $50 and began the course almost immediately. In signing up for the course, plaintiff filled out forms which stated that she was applying for membership in the Church of Scientology and which explained that Scientology was a religion. Because she was 17 years old at the time, she was required to get permission from her mother to take the course and did so. Plaintiff did not pay any attention to the explanations of the religious nature of the courses because she was told that she had to fill out the forms in order to be allowed to take the communications course, and that was all she was interested in.

Plaintiff found a job working full-time in an engineering office in Portland and was living with a non-Scientologist roommate. She testified that she would go to work until 5 p.m. or 6 p.m. and then attend class every evening from about 7 p.m. until between 10 p.m. and midnight. She also attended class at least one full day, and often both days, on weekends. This schedule continued from July 13, when she began the communications course, until the beginning of October, when she moved to Delphian. At the same time, plaintiff maintained contact with family members and friends in the Portland area, visiting them a number of times and corresponding regularly with her mother.

The communications course in which plaintiff first enrolled consisted of a set of "drills" which were practiced on an individual basis with a supervisor. As part of each drill plaintiff would read bulletins which described the theory of the particular drill to be undertaken. She was

---

[8] It may well be that much of the *effect* on plaintiff that is alleged is not "emotional distress" either, but we need not consider here whether recovery for such effects may be had in an action for outrageous conduct. We note that the misrepresentations which are re-alleged are the same misrepresentations which form the basis for the fraud action. These representations are not separately sufficient to be actionable as outrageous conduct.

then "checked out" on that information to be certain that she understood what she had read. Then she would practice the drill "to a win," that is, until she could complete the drill as prescribed. After completing each of eight drills, plaintiff repeated each on a more difficult level until a final pass was achieved.

The drills were described by plaintiff at trial. The first drill involved reading a bulletin entitled "How to Study" and being checked out on it. The second drill involved reading the prescribed bulletin and then sitting across from another person with eyes closed and attempting to clear her mind of all thoughts and to eliminate all outside influences or distractions. She testified that she practiced this drill for "a couple of hours" before her supervisor indicated that she had completed it to a win. The third drill involved the same procedure, except that she sat across from her supervisor with her eyes open.

The fourth drill is called "bullbaiting." Plaintiff described it as follows:

"* * * You're sitting with your eyes open facing another person. The other person, while you're sitting there staring at them, tries to distract you by telling you jokes, making fun of you, pointing at you, touching you, making faces at you, trying anything that they can to make you laugh or twitch or cry or frown - make any sort of acknowledgement that you heard what he said or saw what he did.

"And the objective is to be able to sit there while that person says anything to you and does anything around you without thinking about what they're doing, and without getting mad - making any gestures.

"Q: How was it practiced on you?

"A: Well, first of all they started by just telling me jokes and I like a good joke and I would laugh. And they would say: Flunk, you laughed. And they would start you all over again on the same drill and they would tell the same jokes until they reached a point that you no longer laughed at it.

"They would make fun of me. * * * Well, they teased me about my religion; they teased me about sex; they teased me about my looks. Some of them made gestures toward me like coming up close to me as if they were going to kiss me or touch me. * * * As soon as they found an area that caused me to laugh more or to frown or to cry, they would

go into that area in depth and * * * try and get me embarrassed or to cry or make some sort of reaction.

"Q: Did they use obscene words or any foul language?

"A: Yes, they did. I was embarrassed by obscene words and they used obscene words a lot. Every obscene word that I ever heard was used.

"Q: Were you reduced to tears?

"A: Yes, I was, at times.

"Q: How long did the bullbaiting thing go on?

"A: I was bullbaited several different times during the communications course, through three weeks."

After plaintiff was able to complete the bullbaiting drill, she participated in teaching it to other people.[9]

The next drill required that plaintiff read sentences from Lewis Carroll's *Alice in Wonderland* and *Through the Looking Glass* until she was able to read without any inflection. After that drill plaintiff participated in a drill which was described as "learning to acknowledge someone."

"And in that drill the person that's acting as coach would * * * ask you a question and all you were supposed to do is acknowledge them by saying: 'Good,' or 'Yes.' And you weren't supposed to put again any inflection in your voice. You were supposed to just say it. * * * There was no specific meaning to it or anything; just to get the person to know that you heard what they said.

"Q: What type of questions were asked?

"A: There were two questions; one was * * * I don't think they were all questions. I think the person just read phrases out of the books 'Through the Looking Glass' and 'Alice in Wonderland.' "

The next drill was learning how to receive an acknowledgment from a person.

"And what that was there were two questions. The first one was 'do fish swim' and the second one was 'do birds fly.' * * * [Y]ou sat across from the coach and you say to him: Do fish swim. And the coach tries to ignore you and you try to say it in as much of a forceful manner that you get an acknowledgement from him. And he will sit there

---

[9] There was other testimony regarding the experiences of others in bullbaiting on other occasions when plaintiff was not present. However, in considering defendants' conduct toward this plaintiff, we consider as relevant only what plaintiff experienced.

and laugh at what you're doing, or totally ignore you. And you're supposed to just sit there and stare right at him and clear your head of all thoughts and ask him this question with such force that he feels he has to answer you.

"And then, as another step up from that same drill, the coach, instead of just ignoring you or laughing, will begin to make remarks just like in the bullbaiting drill. You will say: Do birds fly. He will say: I don't know, what do you think. And then you're supposed to just repeat the question 'Do birds fly' until you get him to answer. And he will - sometimes the person will say that they have a headache or that they want a drink of water and you're supposed to say - you're supposed to get them to forget that they have a headache or that they need something and to answer your question for you."

Plaintiff's memory was not clear on four further drills, called "upper indoctrination" drills. One involved reading a bulletin entitled "What is Control," which plaintiff remembered as "telling you how to control people and how to achieve the response and the actions that you want to achieve from the other person." Another involved learning commands, such as "Look at the wall, walk over to that wall, touch that wall, turn around." In another drill,

"* * * you give a command to [an] ashtray as you hold it in front of you. I can't remember what the commands were, but they were something like * * * 'Rise up,' or something. And you raise the ashtray up and you do this drill over and over until you are convinced that you have told the ashtray to move and it has moved."[10]

Plaintiff completed the communications course in about one month. However, on July 25, 1975, less than two weeks after she started that course, she signed up for another, known as the Student HAT course, for which she paid $250 to the Mission. While she was taking the communications course she was also approached by the Mission staff about receiving "auditing," for which certain claims were made that are included among the misrepresentations alleged in the fraud action. When she was approached about "auditing" by a staff member, he told her everyone has "hangups" that inhibit communication and asked if she

---

[10] There was some other testimony concerning the type of activities involved in the "upper indoctrination" drills. Although somewhat more detailed, it is substantially the same as plaintiff's descriptions.

would like to get rid of all of her hangups and improve herself. Plaintiff signed up for auditing because the staff member told her it was the best thing she could do for herself, she was convinced that it was, and she wanted to develop herself to her fullest potential. On July 26, plaintiff paid $780 and on July 31, she paid an additional $1100 for a number of hours of auditing.

Because she did not have the money to pay for the hours of auditing she was told she would need, plaintiff was coached by Mission staff members to borrow money from friends and family. The staff members helped her to call people and ask to borrow money. A staff member would tell her the type of conversation to use and sit there while she called, giving her ideas and suggestions. In the evenings when she went to the Mission she would take courses for a while and then be asked to come to a staff member's office to make phone calls. She borrowed $700-800 from friends and family and another $500 from Freedom Federal Credit Union, which is operated by Scientologists.

Plaintiff began the Student HAT course and the auditing right after completing the communications course, approximately in mid-August. She took the course on weekends and participated in auditing in the evenings during the week. As explained above, the purpose of auditing is claimed to be to relieve the negative effects of past experiences. This is accomplished by the use of an "E-meter," which is a crude galvanometer. The individual receiving the auditing holds what are described as two tin cans, one in each hand. The cans are connected to a device which has a needle which reacts in some manner to the responses made.[11]

Plaintiff testified that the auditor would ask a question, such as "Do you have any problems with your

---

[11] The E-meter was described in *United States v. Article or Device, etc.,* 333 F Supp 357 (DDC 1971):

"The E-meter is essentially a simple galvanometer using two tin cans as electrodes. It is crude, battery-powered, and designed to measure electrial skin resistance. It is completely harmless and ineffective in itself. A person using the meter for treatment holds the tin cans in his hands during an interview with the operator who is known as an auditor and who purports to read indicators from the galvanometer needle as it notes reactions to questions. * * *"

parents?" She would describe a particular argument, and he would ask if there were earlier, similar times she had had arguments with her parents. She testified that he would take her back earlier and earlier until he decided she had related the earliest incident and her "needle was floating." The auditor would then go on to another question.

The time spent on auditing varied. Plaintiff testified:

"I spent at least two hours, and often as many as five or six hours in auditing. If a point was reached, after a couple of hours, where I was pretty happy, then the auditor would end the session. But if during the course of the questions he asked me, I became very upset and cried or wouldn't answer his questions, he would keep asking me questions over and over again until I reached a point where he felt it was safe to end the session.

"There was a rule that in auditing that the auditor could never let the person leave when they were upset. And so I remember a number of times that I became real upset and just wanted to leave and go home and get out of the place, but he said: No, just sit down. The way out is the way through, was the phrase he used. What upsets you the most by talking about it more with me will help you overcome it."

The Student HAT course involved listening to tapes of lectures by L. Ron Hubbard, the founder of Scientology, and reading various bulletins, after which plaintiff would be examined to determine whether she knew the material contained in each one. These materials concerned proper study habits and methods and the values of auditing.

In conjunction with the Student HAT course, plaintiff attended Friday evening "musters," which all students in the communication course and the Student HAT course were required to attend. According to plaintiff, the purpose of these meetings was "to discuss our progress on the course and reinforce one another, telling each other how many points we had made."[12] She described the musters as follows:

---

[12] The students received points for what they learned in the courses, and a charting system was maintained in which each student's points were recorded to show his or her progress in Scientology.

"Well, I would go into the graduation room and be seated and then someone would come in that was officiating that night. And it varied, like the person would come in and usually do something to get everybody to relax. One of the most common things they did was to say: I want everybody in here to introduce themself to two people in the room that they have never met before. And then the people would do that and they would be relaxed and then he would start talking about Scientology and Dianetics and communications course and all of these things and how we were all going to become part of clearing the planet or making sure that everyone on the planet got Dianetic auditing.

"Sometimes they did little drills like: Once a person asked us to locate a space around us that we would call ours and then everyone would sit there and do that. And he would say: Now increase that space - increase that space to include you and two people beside you, and you do that. And then he would say: Increase the space to include this room, and we did that.

"He would say: Increase the space to include the whole world, and you just bodily increased it to that spot. And he said: See what it is going to be like. We are going to increase ourselves until we get everyone on this planet clear."

The graduates of the courses would stand up and tell the group what they had gained from the course. They would

"* * * say how it had changed their lives and how they were - they had finally found meaning and finally found a way to improve themselves and rid themselves of their harmful past, emotions and attitudes."

Around the end of August or the beginning of September, staff members at the Mission began to talk to plaintiff about becoming a staff member. They told her how rewarding it was, and they began to talk about Delphian. Certain of the claims made for Delphian are included as misrepresentations alleged in the fraud count. According to plaintiff's testimony, she was told that she could take courses at Delphian which could be applied toward a college degree, that she would learn about architecture and engineering "from the ground up" and that Delphian was partially funded by government grants for doing research in solar and wind energy and recycling. Plaintiff decided that going to Delphian would be the best way to combine her

interests in architecture and engineering with her interest in Scientology and Dianetics. She informed her parents that she would not be going to college that fall as she had planned; instead, she applied to Delphian as a provisional staff member. After visiting her parents' home in Montana in September, she moved to Delphian at the beginning of October.

Plaintiff was assigned to live in a room with two other women and two children. She had a small space for her belongings. She worked harvesting crops for a couple of weeks after she arrived and then helped to move an old garbage dump on the property. In the evenings, she worked indoors cleaning floors, washing dishes and other such tasks. Her work day extended from 8:30 a.m. to 11 p.m. or later. After three or four weeks, she was assigned to care for small children of other staff members. She was given instructions on using Scientology methods in caring for the children. She worked as a "nanny" until she left Delphian. She received wages of a few dollars a week.

Visitors were not encouraged at Delphian, and plaintiff was instructed that two-weeks notice was necessary if visitors were coming. She described one incident that occurred around Halloween when she was reprimanded because her mother and one of her friends from Montana came to visit unannounced. Plaintiff's mail was sometimes opened before she received it at Delphian.

Beginning in October and continuing into November, plaintiff reported to Delphian staff members that her mother was very concerned about her involvement with Scientology. She had been told that she must report that kind of activity, because if it was upsetting to her it would inhibit her progress in Scientology. Plaintiff eventually became aware that her mother had hired a lawyer to find a way to get her away from Delphian. She informed the staff of this action and that her mother had also gone to the media.

Plaintiff was told that this kind of activity was bad for Scientology and that it would give Delphian and Scientology a bad reputation. She was told that she would have to leave Delphian until she could "handle" her parents,

which meant that she must convince them to sign a statement that they would not sue, attack or embarrass Scientology or Delphian.

Plaintiff left Delphian in late November or early December and returned to Portland. She began working as a waitress in an hotel and lived in a house with several other people, including her friend Osler, who had also been at Delphian during the time plaintiff was there and had left when she did. Plaintiff went to the Mission and saw staff member Jim Brooks, who was to help her handle her parents. She was told that she could not take any classes or auditing until she could handle them. She was informed that in order to continue in Scientology she had to handle her parents or "disconnect," *i.e.,* cut off all relations with them.

Brooks coached her on what to say in letters to her parents to convince them to allow her to continue in Scientology without interference. Plaintiff obtained permission from Brooks to go home for Christmas to attempt to handle her parents. She rode home with her brother, who lived near Portland. Her parents would not agree to plaintiff's requests, and plaintiff returned to Portland with Osler.

Under the direction of Brooks, plaintiff wrote her parents a letter on January 5, 1976, informing them that she was no longer involved with Scientology. Although that was not true, Brooks told her it would help her family "destimulate." She continued to report her parents' activities to Brooks, including an unsuccessful attempt to hold plaintiff in an hotel for "deprogramming." Brooks coached plaintiff in writing letters to her parents, either asking that they not interfere with her involvement in Scientology or "good road, fair weather" letters avoiding the subject of Scientology.

Plaintiff also met with Kay Wilson from COSOP, who told her that if she wanted to continue in Scientology she would have to disconnect from her parents. Regarding that conversation, plaintiff testified:

"We were discussing my mother and I told Kay Wilson that my mother had hired an attorney and that she had told me all these things about Scientology I had never heard about. My mother mentioned something about a

Fair Game Law and I said that to Kay Wilson. And she said: Oh, that policy letter has been cancelled. However, the treatment of suppressive persons is still the same."

A "suppressive person" is one who attempts to damage or interfere with Scientology. The Fair Game policy was proclaimed by L. Ron Hubbard in a policy letter of October 18, 1967. It stated that suppressive persons "[m]ay be deprived of property or injured by any means by any Scientologist without any discipline of the Scientologist. May be tricked, sued, lied to or destroyed."[13] Plaintiff testified that she had been shown several policy letters regarding treatment of "suppressive persons." Plaintiff had been told that her mother was suppressive.

Plaintiff did not want to disconnect from her parents, but she did want to continue in Scientology. She asked for permission from Brooks to go back to Montana to persuade her parents to agree not to sue, attack or embarrass Scientology and not to interfere with her involvement in it. She made the trip in April, 1976. When she arrived at her parents' home, she was locked in the house and "deprogrammed." As a result, plaintiff decided that she did not want to return to her involvement in Scientology, and she did not.

■ Whether viewed as individual acts or taken together as a "scheme," we find nothing in this record which constitutes conduct which is "beyond the limits of social toleration." There is no evidence that plaintiff was threatened or forced to remain involved in Scientology. To the contrary, she maintained many contacts with non-Scientologists. She had a full-time job both before and after her stay at Delphian. The record shows that she visited with relatives living in the Portland area periodically while she was there. She maintained correspondence with her parents and went back to Montana twice before her visit in April when she was "deprogrammed." Her parents or her mother visited her several times in Portland or at Delphian. Plaintiff became involved and maintained her involvement

---

[13] Defendants maintain that this policy had been cancelled. There was conflicting evidence as to the status of the policy and its meaning. We need not resolve those conflicts because the mere existence of the policy does not constitute outrageous conduct as to this plaintiff.

because she desired to do so. If misrepresentations were made regarding the benefits or the nature of Scientology which gave rise to that desire, her remedy would be for fraud, not outrageous conduct.

Plaintiff was recruited and indoctrinated into the Church of Scientology. That recruitment and indoctrination, as far as this record discloses, were not so very different than might be used by any number of organizations. She joined the group voluntarily, albeit, as she claims, on the basis of misrepresentations made to her. However, she continued to participate and maintained her involvement for whatever reason without actionable threats or coercion by defendants.

The drills plaintiff was subjected to as part of the communications course she initially signed up for were not in themselves outrageous. Plaintiff studied the theory behind each drill before participating in it. She returned day after day to participate in the course, although she had daily contact with non-Scientologists in her job and at her apartment with her non-Scientologist roommate. The most that can be said is that plaintiff was convinced by defendants to accept what they were teaching; unless the means involved more than persuasion, that is not outrageous. Whether or not we find any merit to defendants' teachings, plaintiff apparently did find merit in them during the time she was associated with Scientology. The fact that she was later convinced of their invalidity does not make defendants' conduct outrageous *post hoc.*

The only evidence which supports the allegation that plaintiff was caused "to believe and fear that she would be subject to severe punishment should she ever bring suit against Defendants, voice her disapproval of Defendants' practices, testify against Defendants, demand a return of money from Defendants or commit any other act Defendants determined to be against their interests" is the testimony regarding the Fair Game policy. Plaintiff testified that *after* she was "deprogrammed" she was fearful of retaliation by defendants. There is no evidence that *during* her association with Scientology plaintiff was afraid to terminate her involvement or feared defendants in any way. The fact that she was informed of a policy known as Fair Game is not outrageous conduct.

We hold that the evidence presented under Count I of the outrageous conduct cause of action does not, as a matter of law, establish conduct that is outrageous in the extreme or beyond the limits of social toleration.

■ Count II of the outrageous conduct action[14] alleges that:

"Subsequent to Plaintiff's deprogramming, Defendants have pursued a course of conduct against Plaintiff that is designed to threaten, humiliate, and intimidate Plaintiff and cause her fear, anguish and mental distress. Defendants on June 7, 1977, filed suit against Plaintiff without cause and for the purpose of intimidating Plaintiff; Defendants have, in June of 1976 and April of 1977, declared Plaintiff to be a suppressive person subject to Defendants continuing 'fair game' policy of retribution which directs Defendants' organizations and other Scientology organizations and their members to trick, lie to or destroy Plaintiff. Defendants have, beginning in June of 1976 and continuing to the present, forbid, through threats of mental and physical harm, any friends of Plaintiff connected with Defendants from communicating with Plaintiff; Defendants have caused and continue to cause the mailing of materials to Plaintiff and Plaintiff's family subsequent to Plaintiff's request that such mailings cease."

Defendants moved for a directed verdict on this count as well, on the basis that the conduct proved was not such that it could subject them to liability.

The evidence established, first, that a libel action was filed by certain of the defendants against plaintiff after a press conference in which plaintiff participated. That matter was still pending at the time of the trial of this action. We said in *Erlandson v. Pullen*, 45 Or App 467, 472, 608 P2d 1169 (1980):

"Without necessarily suggesting that it could never be so, we note that it would be a rare case in which the bringing of a lawsuit would fit the definition of outrageous conduct. This tort has been reserved for 'intentional acts of

---

[14] This count was withdrawn as to defendant Delphian at the close of the evidence. COSOP and defendant Samuels contend that no involvement by them was shown. Because of our disposition of this count on other grounds, we need not reach that issue. We use the term "defendants" here without delineating whose involvement was shown.

a flagrant character under most unusual facts and circumstances * * *' *Melton v. Selen,* 282 Or 731, 736, 580 P2d 1019 (1978)."

Here the record reveals nothing about the other case except that it was an action for libel. We do not know, nor can we infer from this record, that it was without foundation. Such proof would not even support an action for abuse of process without evidence that plaintiff had prevailed. *Erlandson v. Pullen, supra.* Filing such a suit is not outrageous conduct.

There is evidence that plaintiff was declared a suppressive person by certain individuals connected with the Mission. Plaintiff testified at trial that she knew she had been declared suppressive because that is what is done. At her deposition, she testified that someone had told her that she had been declared suppressive. However, there is no evidence that *defendants* informed plaintiff that she was declared suppressive and subject to the Fair Game policy, or knew or intended that she be so informed.[15]

The only evidence that defendants forbade, "through threats of mental and physical harm, any friends of Plaintiff connected with Defendants from communicating with Plaintiff" is a document issued June 7, 1976:

"All staff are hereby notified not to attempt to contact or interfere with JULIE CHRISTOFFERSON or PATRICK OSLER in any manner. These two persons have attacked the Church of Scientology so I repeat, they are not to be communicated to for any reason.

"If either of these two contact any one in the Church, or if any associates of theirs try to contact any one of the Church, report this action * * * immediately."

This directive followed a letter sent on June 6, 1976, by an attorney on behalf of plaintiff and Osler. That letter said:

"This office represents Julie Christofferson and Patrick Osler, formerly members of your group. Enclosed are photocopies of affidavits to the effect that they have both been deprogrammed, and that they request legal assistance should you make any effort to induce them back into the

---

[15] At her deposition, plaintiff testified that she did not know whether she had been declared suppressive. Later, however, she said she had been told by someone that she had been declared suppressive. She stated that she could not remember who had told her, but thought it was someone who left Scientology after she did.

cult. Naturally, a large civil action would be an expected element of any such legal assistance. Therefore you are hereby on notice that any attempt to contact them, or to interfere with them in any manner, will result in most grave consequences to you."

In addition, a former staff member of the Mission testified that they were told at a staff meeting not to communicate or associate with plaintiff or Osler under any conditions, or if they did so, to write it up immediately.

Following, as the directive had, the letter from plaintiff's attorney demanding that defendants not contact plaintiff in any way, the orders that plaintiff's demand be met can in no way be considered outrageous conduct. There is no evidence that any threats of mental or physical harm were made to enforce the prohibition on contact with plaintiff.

The mailings of which plaintiff complains were, with one exception, from the American Saint Hill Foundation (known as ASHO) in California, a Scientology organization. Several personal letters to plaintiff, signed by individuals she did not know, asked about her progress in Scientology. Some of those letters contained brochures on Scientology. In addition, two editions of a newsletter entitled *Cause,* also published by ASHO, were received by plaintiff. Finally, plaintiff received one form letter with brochures from COSOP. Plaintiff does not seem to contend that the contents of the letters were offensive, but she testified that she was made fearful by the fact that she received mail from Scientology organizations at all. Certain of the mailings were addressed to plaintiff's last Portland address and were forwarded to her in Montana. Others were addressed to the post office box which was her Eureka, Montana, address.

Mailing letters, brochures on Scientology and a newsletter which were in themselves innocuous cannot constitute outrageous conduct. There was nothing sinister in any of the material plaintiff received. Neither was there anything mysterious about the fact that plaintiff's forwarding address was obtained, for it is clear that certain of the items were forwarded by the post office and that the envelopes contained an "address correction requested" imprint.

In addition to what was alleged in her complaint, plaintiff also presented evidence at trial, without an objection that it was outside the scope of the pleadings, of three incidents which made her fearful. Once, a couple of months after she left Scientology, she was in Portland and was walking down the street with Osler near the house in which she was staying. They noticed a car parked about a block from the house, and Osler recognized the person in the car as a Scientologist. They walked up to the car and asked the person what he was doing. He did not answer but started the car and drove away. Later that afternoon plaintiff noticed a van parked about a block from the house and, as they approached the van, it drove away. Osler recognized the person driving as a Scientologist.

Finally, in June, 1976, plaintiff and Osler were out walking and noticed two Scientologists behind them. They walked into the library and were followed into one of the library rooms. There the two Scientologists sat down at a table and stared at them while they looked at books. When they started to leave, the Scientologists got up, but plaintiff and Osler left quickly and did not see them after that. These three incidents, either singly or taken as a group, cannot conceivably be called outrageous conduct.

We have reviewed the record as it relates to the conduct which plaintiff claims to be outrageous. We recognize that plaintiff does not claim that any particular action, by itself, would constitute outrageous conduct, but rather contends that the actions together rise to the level of actionable conduct. We find as a matter of law that the conduct shown is not actionable as outrageous conduct, whether viewed as individual acts or as a course of conduct. Defendants' motions for directed verdicts on the cause of action for outrageous conduct should have been granted.

## FRAUD

We turn to plaintiff's cause of action for fraud. Plaintiff's complaint contained the following allegations:

"VII

"Between July, 1975 and April, 1976, in Oregon Defendants Church of Scientology, Mission of Davis, Church of Scientology, Portland, and the Delphian Foundation made the following misrepresentations regarding the standard,

quality, grade, sponsorship, status, characteristics, ingredients, uses, benefits, character or qualities of the courses or goods offered by Defendants when they knew or should have known that such representations were false:

"*STUDENT HAT AND COMMUNICATIONS COURSE*

"(1) * * * the Church of Scientology Communication Course would provide more knowledge of the mind than is possessed by any psychologist or psychiatrist.

"(2) * * * the communication course was completed and endorsed by Father Pat Flanagan of Boys' Town, Omaha, Nebraska. * * *

"(3) * * * the communication course would help the Plaintiff in college work and that the course was offered on a money back guaranteed basis. * * *

"(4) * * * [the] student HAT course enabled a student to understand any subject better and more accurately. * * * the Student HAT Course was offered on a money back guaranteed basis.

"PLAINTIFF WAS FURTHER INDUCED TO ENGAGE IN A PROGRAM KNOWN AS AUDITING BY THE FOLLOWING REPRESENTATIONS:

"(5) * * * auditing relieves the effects of past experiences. * * * through auditing she would have more knowledge of the mind than any psychiatrist or psychologist and more knowledge of the bodily processes than any doctor.
"* * * * *.

"(a) Auditing develops creativity;

"(b) Auditing increases I.Q. scores;

"(c) Auditing cures neuroses, criminality, insanity, psychosomatic ills, homosexuality and drug dependence;

"(d) Auditing allows one to control his own emotions and the physical universe; and

"(e) Auditing was offered on a money back guaranteed basis.
"* * * * *.

"PLAINTIFF WAS INDUCED TO ENGAGE IN THE STUDY OF 'DIANETICS' BY THE FOLLOWING REPRESENTATIONS:

"(8) * * * Dianetics is scientifically provable and that it cures asthma, arthritis, rheumatism, ulcers, toothaches, pneumonia, colds, and color blindness. * * *

"(9) * * * L. Ron Hubbard, the creator of auditing, is an engineer and nuclear physicist and has a degree from

Princeton University and an honorary degree from Sequoia University and is a graduate of George Washington University who revealed Dianetics to mankind as a service to humanity, with no intent to profit therefrom. * * *

"(10)    * * * L. Ron Hubbard had a civil engineering degree; a 'B.S.' degree and was a nuclear physicist, a graduate of George Washington University; and had received an honorary degree from Sequoia University and Princeton University;

"DEFENDANTS FURTHER INDUCED PLAINTIFF TO QUIT HER JOB AND LIVE AND WORK AT THE DELPHIAN FOUNDATION BY MAKING THE FOLLOWING REPRESENTATIONS:

"(11)    * * * Delphian Foundation was funded by government grants for developing education and alternative energy sources; further that Plaintiff could take courses at the Delphian Foundation that could be applied by an accredited college toward a college degree.

"(12)    * * * L. Ron Hubbard was a graduate of George Washington University, was an engineer and nuclear physicist and had an honorary degree from Sequoia University and that the Delphian Foundation was nearing accreditation and had almost been accredited in September of 1975; further that in the Spring of 1976 Plaintiff could take courses at the Delphian Foundation that could be applied by an accredited college toward a college degree.

"(13)    * * * [Plaintiff] could attend school at the Delphian Foundation and, after such study, be able to obtain college credit hours in architecture or engineering at any college in the country merely by taking a test.

"(14)    * * * [Plaintiff] would obtain at the Delphian Foundation an education superior to any University in the world.

"* * * * *."[16]

We first consider the motions for directed verdict made by each of the parties on other than constitutional grounds. COSOP moved for a directed verdict on the ground that plaintiff had not shown that any of its agents or employes had made any of the misrepresentations alleged. COSOP argues on appeal that that motion should have been granted.

---

[16] Defendants do not argue that these alleged statements may not be fraudulent, at least under some circumstances.

Plaintiff's complaint alleged that the misrepresentations were made by specific individuals who were agents or employes of the Mission or Delphian. None of the individuals named is claimed to have been an agent or employe of COSOP. The complaint did allege that the misrepresentations were repeated by various employes of defendants and that they were contained in literature provided to plaintiff by COSOP. However, at trial, plaintiff did not introduce any evidence that the statements were made by employes of COSOP or that she was provided with any literature by COSOP.

There is evidence that plaintiff paid $75 to COSOP for a "Lifetime HASI" on July 30, 1975. HASI is an acronym for Hubbard Association of Scientology International. HASI membership entitles one to a 10 percent discount on purchases from all Scientology organizations. Plaintiff contends that COSOP may be held liable for the misrepresentations made by employes of the Mission, because it received money from plaintiff while knowing about the fraudulent practices employed by the Mission. She does not contend that actual knowledge was shown, but only that COSOP had constructive knowledge of the marketing practices of the Mission and of the claims that were made for the courses offered.

Assuming without deciding that COSOP could be held liable on such a basis, we find no evidence, nor has plaintiff pointed to any, to indicate that COSOP was aware on July 30, 1975, when plaintiff paid $75 for the HASI membership, that plaintiff had had any contact with the Mission at all. The only evidence regarding the $75 payment to COSOP is a receipt. Plaintiff did not testify to the circumstances surrounding that payment and, in fact, testified mistakenly that she had not paid any money to COSOP. The fact that both COSOP and the Mission are Scientology organizations does not by itself provide a sufficient link to hold COSOP liable for what may have been done by the Mission. Neither does the fact that policy letters and bulletins written by L. Ron Hubbard are espoused by both COSOP and the Mission make COSOP liable to this plaintiff.

Plaintiff has not shown that the Mission acted as an agent for COSOP, nor does she claim that such a

relationship existed. She has shown no basis upon which COSOP may be held vicariously liable for the actions of the Mission. We conclude that the motion of COSOP for a directed verdict on plaintiff's action for fraud should have been granted.

■     Delphian's motion for directed verdict was on the ground that none of the statements alleged by plaintiff were made by any of its agents or employes and that plaintiff had already paid the $3,000 she claims was procured by fraud long before she went to Delphian. Although the complaint alleges that certain of the misrepresentations were made or repeated by employes of Delphian, plaintiff appears to concede in her brief that there is no evidence to support that allegation. Plaintiff argues, however, that Delphian should be held liable because 1) the relationship between the Mission and Delphian was such that Delphian should be held liable; 2) Delphian confirmed certain of the misrepresentations regarding its funding, structure and courses in a data sheet given to plaintiff to read to acquaint her with Delphian when she arrived; and 3) Delphian did receive some money from plaintiff, apparently for books, and also received free labor from plaintiff while she was there.

Plaintiff does not state the theory behind her contention that the relationship between Delphian and the Mission is such that Delphian should be held liable for misrepresentations made by the Mission. The evidence she points to in support of her contention is as follows:

"* * * Mission of Davis has a branch at Sheridan on the Foundation premises * * *, the management of Mission of Davis is centered at Sheridan * * *, and that Mission of Davis, Delphian Foundation and the Sheridan Mission all co-exist on the same property to such an intertwined extent that a memorandum was necessary to prevent confusion in writing out purchase receipts * * *. The two organizations have a common president, Martin Samuels * * *, who lives at Sheridan * * *.

"Additionally, [the Mission's] representations were not made coincidentially, but as part of a policy calculated to induce members who had spent all their available funds for courses in auditing at the Mission, to work at the Delphian Foundation in return for further courses and auditing * * *."

It is not clear whether plaintiff is suggesting that the Mission acted as the agent for Delphian in making the representations or that the two corporations are in reality one entity, *i.e.,* an alter ego theory.[17] The evidence adduced at trial does not support "piercing the corporate veil" so as to permit treating the two corporations as one or as the alter ego of defendant Samuels. The memorandum to which plaintiff refers shows only that the affairs of the corporations *were* maintained separately. One shared corporate officer and shared facilities are not enough to permit such an approach. *See Howco Leasing Corp. v. Oregon Lumber Export Co.,* 283 Or 225, 228, 582 P2d 4 (1978); *Schlecht v. Equitable Builders,* 272 Or 92, 535 P3d 86 (1975); *Wakeman v. Paulson,* 257 Or 542, 480 P2d 434 (1971); *A. J. Rose & Son, Inc. v. Bd. of Funeral Dir.,* 31 Or App 537, 570 P2d 1008 (1977).[18]

We also find no evidence to support a finding that the Mission was acting as the agent of Delphian in making the alleged misrepresentations.[19] Our responsibility at this stage of the proceedings is to decide whether there is any evidence which would support a reasonable inference of agency between the Mission and Delphian. *Briggs v. Morgan,* 262 Or 17, 496 P2d 17 (1972). One essential feature of agency is the right of the principal to control over the agent. "A business organization which operates in its sole and unlimited discretion is not an agent but a principal." *Kuhns et ux v. State Tax Com.,* 223 Or 547, 555, 355 P2d 249 (1960); *and see* Restatement (Second) of Agency, §§ 1, 14 (1958). There is nothing in the record before us to

---

[17] Plaintiff's brief responds to Delphian's argument as follows:

"Defendants' argument presumes, erroneously, that since these misrepresentations were made by someone from 'Mission of Davis' rather than from 'Delphian Foundation,' Delphian is insulated from liability no matter how blatant the misstatements."

Plaintiff then recites the facts quoted above and concludes: "Any claim of no relationship between Mission and Delphian is absurd and contrary to all the evidence." This misses the point—the issue is not whether there was a relationship; the issue is whether that relationship was so close as to give rise to joint or vicarious liability.

[18] Because of our disposition of this issue we need not consider whether the doctrine of "piercing the corporate veil" should be applied differently, or if it may be applied at all, to religious corporations.

[19] Plaintiff does not specifically claim that there was an agency relationship.

support an inference that Delphian had any right to control the actions of the Mission or had actual control over those actions; therefore, there could be no finding of agency.

Plaintiff contends that Delphian may be held liable on the basis of the following statements contained in the data sheet which was given to plaintiff to read when she arrived at Delphian, because these statements "confirmed" the misrepresentations made by the Mission:

"That some 'external' students be accepted for tuition in accordance with our school and university structure.
"* * * * *

"That funding shall be by donations and endowments and by grants for specific projects, and that the full definition of allowable income routes be obtained and used.
"* * * * *

"That apprenticeships be a standard part of any educational program.
"* * * * *

"That there be a designated faculty, both for primary/ secondary school and for the University.
"* * * * *

"That the formal structure of a university be created and maintained, and a program leading to accreditation be developed.
"* * * * *

"That special attention be given to the maintenance of ethical relationships and exchanges among the dynamics of TDF; this shall be the guiding principle behind decisions as to techniques and orientations in architecture, agriculture, forestry, utilities, etc. * * *"

The statements quoted above are contained under a heading "Policies." Plaintiff does not seem to claim that these are misrepresentations in themselves, and they could not fairly be construed as such. There is no evidence to suggest that they were not the policies of Delphian; neither do the statements show a connection between Delphian and the Mission sufficient to permit a finding of agency or an alter ego situation. They do not aid plaintiff.

Finally, plaintiff argues from the fact that Delphian received some money from plaintiff and also received the benefit of her free labor that Delphian can be held liable for misrepresentations made by the Mission. As

with the COSOP motion, we need not decide if that is a viable theory of recovery because, at the close of all the evidence, the trial court struck plaintiff's claim that Delphian had received free labor and was paid money by plaintiff. Plaintiff has not contended here that that was error.

We conclude that there is no basis in this record for holding Delphian liable for any misrepresentations made to plaintiff and that its motion for directed verdict should have been granted.[20]

■    Defendant Samuels' motion for directed verdict was based on the ground that he had not participated in the alleged fraud and could not be held liable to plaintiff merely because he is the president of the Mission. The Oregon Supreme Court held in *Osborne v. Hay,* 284 Or 133, 145-46, 585 P2d 674 (1978), that

"* * * in order to hold the officer of a corporation personally liable for fraud by an agent or employee of the corporation it is necessary to show that the officer had knowledge of the fraud, either actual or imputed, or that he personally participated in the fraud. *See McFarland v. Carlsbad Sanitorium Co.,* 68 Or 530, 536-537, 137 P 209 (1914), and *Hoff v. Peninsula Drainage Dist.,* 172 Or 630, 643, 143 P2d 471 (1943)." *And see McDonough v. Jones,* 48 Or App 785, 617 P2d 948 (1980), *rev den* 290 Or 519 (1981).

There is evidence in the record from which a jury could have found that Samuels had knowledge of at least some of the alleged misrepresentations. It was not error to deny his motion for directed verdict on that basis.[21]

The Mission asserted only constitutional grounds for its motion. Not all of the alleged representations are

---

[20] Delphian argues that plaintiff had already paid all the money she claims to have paid before she had any contact with Delphian and that, therefore, there is no causative link between plaintiff's damages and anything Delphian may have done. Plaintiff did buy some books while at Delphian, but it is not clear whether the amount she spent for those books is included in the amount of damages she claims. Plaintiff's complaint claimed that she was induced to pay the defendants $3,000.20. The receipts that plaintiff introduced at trial add up to something more than that figure.

[21] Samuels is alleged to be liable only because he is resident of the Mission and Delphian. His liability, therefore, is limited by the liability of the Mission. In the remainder of this opinion the term defendants refers to the Mission and Samuels.

claimed to be religious and therefore the motion was properly denied.[22]

## FREE EXERCISE CLAUSE DEFENSE

We now consider the appropriate procedures for dealing with a defense to an action for fraud based on the Free Exercise Clause of the First Amendment.[23] Defendants made a pretrial motion to exclude from the trial "any evidence regarding the validity or sincerity of defendants' religious beliefs and practices." In the alternative, they asked for a hearing

"* * * to determine whether the courses, training, studies, and counseling constitute a part of the religious beliefs and practices of defendants' religious organizations and are thus protected from inquiry as to their validity or sincerity by the Oregon and United States constitutions and applicable law interpretive thereof."

That motion was denied. At the close of the evidence, defendants moved to strike on various grounds certain of the specifications of fraudulant statements. As part of that motion, defendants moved to strike and withdraw from the jury all allegations regarding the communications course, the Student HAT course, auditing and Dianetics on the ground that they constitute religious practices of the defendants. That motion was also denied. Defendants assign error to the denial of both motions. As we will explain hereafter, the pretrial motion was premature, but the motion at the close of all the evidence properly presented the question for the trial court's consideration.

■ A defense based on the Free Exercise Clause presents particular difficulties in an action for fraud. To establish fraud, a plaintiff must ordinarily prove that the representations made were false. *See Meader v. Francis Ford, Inc.,* 286 Or 451, 595 P2d 480 (1979). However, when

---

[22] Defendants claim that the statements regarding the communications course, the Student HAT course, Dianetics and auditing are protected. They do not claim that the statements concerning Delphian or the statements regarding Hubbard's educational background are religious.

[23] Defendants rely on both the United States and the Oregon constitutions for their defense. They do not, however, argue that the scope of the Oregon constitution differs materially from that of the federal constitution and, therefore, we refer only to the First Amendment of the federal constitution in discussing this defense.

religious beliefs and doctrines are involved, the truth or falsity of such religious beliefs or doctrines may not be submitted for determination by a jury. *See United States v. Ballard,* 322 US 78, 64 S Ct 882, 88 L Ed 1148 (1944). The Supreme Court there stated:

"* * * Freedom of thought, which includes freedom of religious belief, is basic in a society of free men. *Board of Education v. Barnette,* 319 US 624. It embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths. Heresy trials are foreign to our Constitution. Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others. Yet the fact that they may be beyond the ken of mortals does not mean that they can be made suspect before the law. Many take their gospel from the New Testament. But it would hardly be supposed that they could be tried before a jury charged with the duty of determining whether those teachings contained false representations. The miracles of the New Testament, the Divinity of Christ, life after death, the power of prayer are deep in the religious convictions of many. If one could be sent to jail because a jury in a hostile environment found those teachings false, little indeed would be left of religious freedom. The Fathers of the Constitution were not unaware of the varied and extreme views of religious sects, of the violence of disagreement among them, and of the lack of any one religious creed on which all men would agree. They fashioned a charter of government which envisaged the widest possible toleration of conflicting views. Man's relation to his God was made no concern of the state. He was granted the right to worship as he pleased and to answer to no man for the verity of his religious views. The religious views espoused by respondents might seem incredible, if not preposterous, to most people. But if those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake the task, they enter a forbidden domain. The First Amendment does not select any one group or any one type of religion for preferred treatment. It puts them all in that position. *Murdock v. Pennsylvania,* 319 US 105. As stated in *Davis v. Beason,* 133 US 333, 342, 'With man's relations to his Maker and the obligations he may think they impose, and the manner in which an expression shall

be made by him of his belief on those subjects, no inter-ference can be permitted, provided always the laws of society, designed to secure its peace and prosperity, and the morals of its people, are not interfered with.'" 322 US at 86-87.

Defendants here were asking by both motions that the trial court determine which of the alleged misrepresen-tations were religious and withdraw from the jury the issue of the truth or falsity of those statements. Rather than make that determination, the trial court submitted to the jury the question of whether the statements were religious, with instructions that it was not to determine the truth or falsity of any statements it found to be religious.[24]

Defendants and amici argue that it is the responsi-bility of the trial court to determine in the first instance the religious character of statements alleged to be fraudu-lent and that, if it is determined that the statements relate to religious beliefs or practices, further inquiry is forbidden. They argue that submission of the question to a jury makes the determination one that is not reviewable after a general verdict, leaving the possibility that a defendant's adherence to unpopular or unorthodox religious beliefs could be made the basis for liability. Plaintiff argues, on the other hand, that it is appropriate for the trial court to determine which statements are religious only if it can do so as a matter of law. She contends that, if the determination requires reso-lution of questions of fact, that resolution is for the jury. Plaintiff further contends that the courses and practices in which she participated were held out to her as secular and that she therefore is entitled to have a jury consider the allegedly fraudulent statements, because they were not religious in the context in which they were made.

Courts have had little occasion to consider the application of a Free Exercise Clause defense in an action for fraud in a jury trial. By far the majority of the cases in this area have been non-jury cases. We have found no cases which have considered this specific issue, and none have been cited to us. In fact, there has been little discussion in

---

[24] Defendants also assign error to the instruction given on the Free Exercise defense and to the failure of the trial court to give certain requested instructions. We consider those assignments *infra*.

even a general way of whether an action or statement is religious is a question of law or of fact. In practice, the issue has been treated as one of fact by many courts, without discussion. *See, e.g., Fiedler v. Marumsco Christian Sch.,* 631 F2d 1144 (4th Cir 1980); *Brown v. Dade Christian Schools, Inc.,* 556 F2d 310 (5th Cir 1977); *United States v. Carroll,* 567 F2d 955 (10th Cir 1977), *but see United States v. Silberman,* 464 F Supp 866 (MD Fla 1979); *People v. Mullins,* 50 Cal App 3d 61, 123 Cal Rptr 201 (1975).

In *Founding Church of Scientology v. United States,* 409 F2d 1146 (DC Cir 1969), a false labeling case, the court directed that, if a new trial were to follow its remand of the case to district court,

"* * * it is incumbent on the trial judge to rule in the first instance whether each item of alleged false labeling makes religious claims and hence cannot be submitted to the jury for the factual determination of whether it is a label for the device in question and whether it is false." (Footnote omitted.) 409 F2d at 1165.

On remand, the district court interpreted this admonition to mean that the trial court should remove from the jury's consideration only those items which made "purely religious" appeals,

"* *.* reserving a presentation of the other literature for determination under instructions differentiating the secular from the religious." *United States v. Article or Device, Etc.,* 333 F Supp 357, 361 (DDC 1971).

We agree with and adopt this approach.[25]

■     The jury is the usual trier of fact in tort cases such as the one before us. Disputes in the evidence should be resolved by the trier of fact. We conclude that the trial court was required to determine the religious character of the alleged misrepresentations only if it could do so as a matter of law, that is, if there was only one conclusion to be drawn from the evidence. We now turn to that question.

---

[25] Although in *Wisconsin v. Yoder,* 406 US 205, 92 S Ct 1526, 32 L Ed 2d 15 (1972), the Supreme Court seemed to undertake to determine on its own, from the record in the case, whether the Amish parents who refused to send their children to secondary school were acting on the basis of religious conviction, 406 US at 215-16, the good faith religious belief of the parents was not questioned by the state. There was no fact dispute to be resolved.

The fundamental qualification for protection based on the Free Exercise Clause of the First Amendment is that that which is sought to be protected must be "religious." *Wisconsin v. Yoder,* 406 US 205, 215-16, 92 S Ct 1526, 32 L Ed 2d 15 (1972). The Mission claims that Scientology is a religion and that statements regarding its beliefs and practices are protected.[26] Plaintiff does not contend that Scientology is *not* a religion, but instead concentrates on the particular representations at issue. She contends that those representations are not religious statements, no matter what the status of Scientology, and that the statements are therefore not protected by the First Amendment.

Plaintiff's approach to this case has been to treat the alleged statements by defendants *in vacuo,* but we do not believe that it is constitutionally permissible to approach them that way. In this case, the issue of whether the allegedly fraudulent statements are entitled to the protection of the First Amendment involves several questions. Statements made by religious bodies must be viewed in the light of the doctrines of that religion. Courts may not sift through the teachings of a religion and pick out individual statements for scrutiny, deciding whether each standing alone is religious. While plaintiff has skipped past the issue of whether Scientology is a religion, we do not believe we can do so, because the answer to that question is pertinent to, although not dispositive of, the determination of whether the statements made by the agents of the Mission are religious.

The Supreme Court stated in *Wisconsin v. Yoder, supra,*

"* * * Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests." 406 US at 215-16. (Footnote omitted.)

And, as noted by the court in *Founding Church of Scientology v. United States, supra:*

---

[26] Because defendant Samuels is only sought to be held liable only as president of the Mission, we look to the protection afforded the Mission. Samuels may be held only to the extent the Mission is liable.

"* * * Though litigation of the question whether a given group or set of beliefs is or is not religious is a delicate business, our legal system sometimes requires it so that secular enterprises may not unjustly enjoy the immunities granted to the sacred. When tax exemptions are granted to churches, litigation concerning what is or is not a church will follow. When exemption from military service is granted to those who object on religious grounds, there is similar litigation. When otherwise proscribed substances are permitted to be used for purposes of worship, worship must be defined. The law has provided doctrines and definitions, unsatisfactory as they may be, to deal with such disputes. * * *" 409 F2d 1160.

██ ██Without attempting an "unprecedented definition of religion," *Malnak v. Yogi,* 440 F Supp 1284, 1320 (DNJ 1977), *aff'd,* 592 F2d 197 (3d Cir 1979), we draw guidance from the case law. We find that, while beliefs relating to the existence of, and man's relationship to, a God are certainly religious, belief in a traditional, or any, "god" is not a prerequisite to a finding that a belief is religious. *Torcaso v. Watkins,* 367 US 488, 81 S Ct 1680, 6 L Ed 2d 982 (1961); *Everson v. Board of Education,* 330 US 1, 67 S Ct 504, 91 L Ed 711, 168 ALR 1392 (1947); *Washington Ethical Soc. v. District of Columbia,* 249 F2d 127 (DC Cir 1957); *Malnak v. Yogi, supra; Fellowship of Humanity v. County of Alameda, supra.* Neither does the fact that Scientology is of relatively recent origin mean that it is not entitled to the protection of the First Amendment. *See Loney v. Scurr,* 474 F Supp 1186 (SD Iowa 1979); *Malnak v. Yogi, supra; Remmers v. Brewer,* 361 F Supp 537 (SD Iowa 1973); *see also United States v. Ballard, supra; Founding Church of Scientology v. United States, supra.* On the other hand,

"[a] way of life, however, virtuous and admirable, [is not entitled to First Amendment protection] if based on purely secular considerations.

"* * * * *

"Thus, if the Amish asserted their claims because of their subjective evaluation and rejection of contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest on a religious basis. Thoreau's choice was philosophical and personal rather than religious, and such belief does not rise to the

demands of the Religion Clauses." *Wisconsin v. Yoder, supra,* 406 US at 215-16; *see also, United States v. Seeger,* 380 US 163, 176, 85 S Ct 850, 13 L Ed 2d 733 (1965); and *see Welsh v. United States,* 398 US 333, 90 S Ct 1792, 26 L Ed 2d 308 (1970).

Courts may not, of course, judge the "truth" or "falsity" of the beliefs espoused by a group in determining its status as a religion; the inquiry here is simply whether the teachings of Scientology are of the *type* that qualify for the protection of the Free Exercise Clause. The record in this case demonstrates indisputably that they are. Although certain of the theories espoused by Scientology appear to be more psychological than religious, we cannot dissect the body of beliefs into individual components. It seems clear that if defendants sought to teach Scientology in the public schools in this country, they would be prohibited from doing so by reason of the Establishment Clause of the First Amendment. *See Malnak v. Yogi, supra; Epperson v. Arkansas,* 393 US 97, 89 S Ct 266, 21 L Ed 2d 228 (1968). The theories of Hubbard are interrelated and involve a theory of the nature of the person and of the individual's relationship with the universe. *See Founding Church of Scientology v. United States,* 409 F2d at 1160.

■ The Mission is incorporated as a tax-exempt religious organization; it has ordained ministers and characterizes itself as a church. It has a system of beliefs, or creed, which encompasses beliefs which are religious in character. We conclude that Scientology is a religion and that the Mission is a religious organization entitled to invoke the protection of the Free Exercise Clause.

■ The second inquiry to be made in determining whether the statements at issue are protected is whether those statements relate to the religious beliefs and practices of the Mission. It is clear that a religious organization, merely because it is such, is not shielded by the First Amendment from all liability for fraud. *See Founding Church of Scientology v. United States, supra; see also Cantwell v. Connecticut,* 310 US 296, 60 S Ct 900, 84 L Ed 1213 (1940). If the statements involved here do not concern the religious beliefs and practices of the Mission, the Free Exercise Clause provides no defense to plaintiff's action.

Defendant presented evidence that the courses and auditing in which plaintiff participated, and about which the alleged misrepresentations were made, were part of the religious beliefs and practices of Scientology. Plaintiff did not, and does not, contest that fact.

The final inquiry involved in determining whether the alleged misrepresentations are protected by the First Amendment is whether the statements, although made on behalf of a religious organization and having a religious character, were nonetheless made for a wholly secular purpose. Although we find that it has been established in this record that Scientology is a religion, that the Mission is a religious organization and that the statements which are claimed to be religious relate to religious beliefs and practices of Scientology, plaintiff did present evidence that the courses and auditing she received were offered to her on an entirely secular basis for self-improvement, thereby creating a jury issue as to that matter. Plaintiff testified that she was told that the term "religion" and "church" were used only for public relations purposes. She also presented testimony from a former Mission staff member that the staff was instructed to avoid the issue of religion when attempting to interest someone in Scientology and that, if pressed, they were to say that it is not a religion.[27]

---

[27] It is suggested in Weiss, *Privilege, Posture and Protection: "Religion" in the Law,* 73 Yale LJ 593, 604 (1964), that

"Because religion can be in conflict with other disciplines, because it cuts across everyday life, we can only know that a claim is based on religion when we are told that it is. The legal basis for stating that a claim is in the religious domain can be that it is held out as being religious in nature.

"* * * * *

"Since the Constitution prohibits defining an area of belief as 'religious,' a man must make it clear that the beliefs he represents are 'religious' if he wants to be free to express them under the constitutional warrant of freedom of religious belief. He has the burden of communicating that he speaks only from the authority of religion. But, once such a burden has been met, then we cannot attack the particular aspects of his faith as fraudulent.

"* * * * *

"What a man presents as a religious claim, then, cannot be attacked. It is only when he makes a representation beyond religious authority that we can apply laws of fraud."

As attractive as this analysis may be, we do not believe that it has been the approach taken by the courts in considering claims for protection under the First

There is, on the other hand, evidence that plaintiff joined the Church of Scientology and that she was told that the courses and practices were religious in nature. Many of the materials which she read contained a statement inside the front cover which indicated that Scientology is a religion, that auditing is a religious practice and that the E-meter is a religious artifact.[28]

In *United States v. Article or Device, Etc., supra,* 333 F Supp at 363-365, the district court, sitting without a jury, found that Scientology services were offered on both a religious and a secular basis and that the E-meter was misbranded because much of the literature explaining its use and expounding on its value was presented in an entirely non-religious context. The court recognized that complete condemnation of the E-meter would encroach upon the religious freedom of those who used the device as a religious artifact. It therefore ordered the device condemned with the provision that it could be distributed only for use in bona fide religious counseling. This case differs from *United States v. Article or Device, Etc., supra,* in that the court there pointed out that there were organizations other than the Founding Church of Scientology that were using the E- meter and offering auditing services. It was the use of the E-meter by the secular organizations which the court forbade. The court did not consider whether use *by the Church* could be on a secular as well as on a religious basis. We believe that such a possibility exists.

There are certainly ideas which may only be classified as religious. Statements regarding the nature of a supreme being, the value of prayer and worship are such statements. There are also, however, statements which are

Amendment. As in *Welsh v. United States, supra,* and *Malnak v. Yogi, supra,* the proponents of a particular doctrine may unwittingly fail to define as "religious" what is, in fact, constitutionally protected as such.

[28] It is clear that in the context of the Establishment Clause the characterization of the activity as non-religious is not a determinative factor. *See Malnak v. Yogi, supra; see also Engel v. Vitale,* 370 US 421, 82 S Ct 1262, 8 L Ed 2d 601, 86 ALR2d 1285 (1962); *Torcaso v. Watkins,* 367 US 488, 81 S Ct 1680, 6 L Ed 2d 982 (1961); *Welsh v. United States, supra.* On the other hand, the characterization of beliefs as religious by one seeking the protection of the Free Exercise Clause is not determinative either. *See Wisconsin v. Yoder, supra,* 406 US at 215-16; *Founding Church of Scientology v. United States, supra; People v. Woody, supra; United States v. Kuch,* 288 F Supp 439 (DDC 1968).

religious only because those espousing them make them for a religious purpose. The statements which are alleged by plaintiff to be misrepresentations in this case are not of the type which must always and in every context be considered religious as a matter of law.

■ We have found that it is established in this case that the Mission is a religious organization and that Scientology is a religion. Plaintiff does not dispute the claim that the courses and auditing she received are part of the religious beliefs and practices of Scientology. It is also uncontroverted that plaintiff applied to join the Church of Scientology, Mission of Davis, before taking any of the courses offered. These facts may be highly persuasive evidence of the contention that the courses and auditing plaintiff received were religious in nature and that the statements made regarding their nature and efficacy were religious statements. There is, however, conflicting evidence which the jury was entitled to consider. Plaintiff presented evidence from which it could be concluded that the courses and auditing were also offered on a wholly secular basis. Because the statements were not *necessarily* religious, plaintiff was entitled to have a jury consider, under proper instructions, the question of whether the statements were made for a wholly non-religious purpose. The trial court was correct, therefore, in refusing to rule before trial as to whether these alleged statements were religious. It was likewise correct in refusing to withdraw the statements from the jury's consideration.

We turn now to the question of the proper instructions to be given the jury in considering the allegations of fraud in this context.

## FIRST AMENDMENT INSTRUCTION

■ Defendants objected to the giving of the following instruction regarding the First Amendment defense:

"The defendants have asserted as an affirmative defense that the Constitutions of the United States and the State of Oregon provide that religious beliefs and doctrines may not be questioned for truth or falsity. To establish this defense, defendants must prove that each of the acts or representations complained of were religious in nature and were held out as such to plaintiff.

"They must further prove that if the acts and representations complained of were held out as religious in nature, that they were held out by defendants as good faith religious beliefs and doctrine. Therefore, if you find that the acts or representations complained of were acts or representations religious in nature and held out as such, and held in good faith belief, then you may not inquire into the truth or falsity of such acts or representations. Your inquiry must end and your verdict shall be for the defendants. However, should you determine that any of the acts or representations complained of were not religious in nature or were not held out as such to the plaintiff, or were not held to be such in good faith, then you may determine the truth or falsity of such acts or representations."

We find the instruction to be an inaccurate statement of the law as it applies to this case and conclude that reversal of the judgment on the fraud cause of action is required.

Defendants first object to the submission to the jury of the question of the religious nature of the statements. That submission was not error. However, the directions for determination of that issue were erroneous. This record establishes that Scientology is a religion and that the Mission is a religious organization. It also establishes that the courses and auditing which plaintiff was induced to participate in are part of the religious beliefs and practices of the Scientology. The Mission is, therefore, entitled to the protection of the First Amendment for statements regarding its religious beliefs and practices unless it is shown that the statements made were part of an offer of those services to the public on a wholly secular basis. The reasonable inference to be drawn from the instruction as given is that a determination should be made for each of the alleged misrepresentations as to whether it was religious and whether it was held out to plaintiff as religious in nature. This fragments the inquiry inappropriately. The question which the jury was required to decide in this case was whether, even though the Mission is a religious organization, it offered the services in question here on a wholly non-religious basis. *See Founding Church of Scientology v. United States, supra.* It is only upon an affirmative finding on that issue that liability can attach for the statements made in this case. The jury was not correctly instructed in that regard.

246

In addition, the instruction that the statements must be held out as religious in good faith is not accurate. The question of "good faith" belief is quite complicated in this case, for the defendants charged with fraud are not the individuals who made the representations, but the religious organizations themselves. It is true that in many cases in which free exercise protection has been sought, courts have looked to whether the one seeking the protection is "sincere" in his or her belief in the doctrine at issue. *See, e.g., People v. Woody, supra; Teterud v. Burns,* 522 F2d 357 (8th Cir 1975). Those cases, however, involve the sincerity of the *individual* claiming the protection.

*United States v. Ballard, supra,* has been cited to us for the proposition that the sincerity of the proponents of religious belief is a proper subject for inquiry in an action for fraud. We do not read *Ballard* so to hold. In *Ballard,* a criminal action for mail fraud, the parties agreed in the trial court that the issue of the truth or falsity of the statements at issue would not be submitted to the jury, but only the question of whether the defendants honestly and sincerely believed the statements they made. After a jury verdict finding them guilty, the defendants contended that it was improper to withdraw from the jury the question of whether the statements made were true or false. The Circuit Court of Appeals agreed and reversed the conviction. On appeal, the Supreme Court held that "* * * the District Court ruled properly when it withheld from the jury all questions concerning the truth or falsity of the religious beliefs or doctrines of [the defendants]." The Court then noted that the defendants urged other grounds for supporting the reversal of the convictions, but it refused to consider those contentions before giving the circuit court an opportunity to consider the issues first. 322 US at 88. *Ballard* did not address the question of the propriety of submitting the issue of the defendants' sincerity to the jury. In addition, the defendants in *Ballard* were the very individuals accused of actually making the statements at issue. The liability of a religious organization for the statements of its agents was not discussed.

In the situation presented here, it is difficult to determine *whose* sincerity or good faith the jury could be asked to determine. Is the religious organization to be held

liable if one of its ministers is less than a true believer? Or is it to be saved from liability if the individual who makes the statement truly believes, but others in the church do not?

In *Founding Church of Scientology v. United States,* *supra,* the court suggested that liability might attach if it were shown

"* * * that an item (book, pamphlet, advertising flier) makes out a self-sufficient non-religious claim for Scientology services, *to which a religious appeal has been merely tacked on."* 409 F2d at 1165. (Emphasis supplied.)

As we have indicated, defendants could be held liable if the jury found that the courses and services offered by the Mission to plaintiff were offered for a wholly secular purpose. A wholly secular purpose means that, at the time they were made to this plaintiff, the statements were made for a purpose other than inducing plaintiff to join or participate in defendants' religion. A wholly secular purpose, in this regard, would include, but not be limited to, the intention solely to obtain money from plaintiff. On this record it would have been proper to instruct the jury that it is possible to find that the services were offered on a wholly secular basis, notwithstanding the fact that plaintiff was required to join the Church of Scientology in order to participate and that the materials she was given to read stated that Scientology is a religion. A jury could find that the courses and services were offered on a secular basis and that a religious designation had been merely "tacked on." Phrasing the issue as one of good faith was therefore misleading and erroneous.

Defendants also contend that the instruction improperly placed on them the burden of proof on the question of the religious nature of the representations. They contend that it was improper to require that they prove the statements were religious when it was plaintiff's burden to prove knowledge of falsity to recover for fraud. Defendants confuse the burden of proving fraud with the burden of proving the affirmative defense of freedom of religion. As this instruction indicates, it is appropriate for the jury to consider the matter of the defense first, before reaching the issue of the truth or falsity of the statements for deciding

the issue of fraud. That approach makes good sense in this context.

In summary, we conclude that the motions of all defendants for directed verdicts on the claims for outrageous conduct should have been granted. The motions of COSOP and Delphian for directed verdicts on plaintiff's action for fraud should have also been granted. The instruction which was given regarding the Free Exercise defense asserted by the remaining defendants was erroneous and requires reversal.

Because of the disposition we have made of the causes of action and counts, this case will have to be retried. We now turn to the assignments of error which raise issues which are likely to arise on re-trial.

### EXHIBITS

██ ██Defendants assign error to the exclusion of three exhibits offered to show the good faith of the individual who informed plaintiff that L. Ron Hubbard had an honorary degree from Sequoia University and a degree from Princeton University. Those exhibits were photocopies of a telegram and two certificates. Plaintiff objected to the exhibits on the grounds of lack of authentication and hearsay. The objections were sustained. Those objections were not well taken. The exhibits were offered to show the state of mind of the individual who made the representations regarding Hubbard's background to plaintiff. That individual testified that he had seen the exhibits before talking with plaintiff and believed them to be true. Neither the truth of the matter contained in the exhibits nor their authenticity was asserted by defendants. The state of mind of the one accused of making fraudulent representations is clearly at issue where one of the elements to be shown is the speaker's knowledge of the falsity of the representation being made. *See Linebaugh v. Portland Mortgage Co.,* 116 Or 1, 239 P 196 (1925); *Seaside, City of v. Randles,* 92 Or 650, 180 P 319 (1919). The exhibits were relevant to that state of mind, and their exclusion was error.

### INSTRUCTIONS

██ Defendants assign error to the giving of certain instructions and the failure to give other instructions. The

first assignment we consider is the failure of the trial court to give defendants' requested instruction defining "justifiable reliance" as follows:

"A party claiming to have been defrauded by a false representation must not only have acted in reliance thereon, but must have been jusified in such reliance, that is, the situation must have been such as to make it reasonable for him, in the light of the circumstances and his intelligence, experience and knowledge, to accept the representation without making an independent inquiry or investigation."

The court instructed the jury that to find for plaintiff it must find that "* * * the plaintiff having a right to do so, reasonably relied upon the representation and did not know it was false." We believe the instruction given by the trial court "adequately and accurately state the applicable law." *Bowlds v. Taggesell Pontiac*, 245 Or 86, 95, 419 P2d 414 (1966); *see also Yardley v. Rucker Brothers Trucking, Inc.*, 42 Or App 239, 600 P2d 485 (1979), *rev den* 288 Or 335 (1980). It was not error for the trial court to refuse to give the instruction requested by defendants.

Defendants also assign error to the failure to give their requested instruction defining "material fact." The court instructed the jury that there must have been "a false representation of material fact" in order to find for the plaintiff on her fraud claim. Defendants requested the following instruction defining "material fact":

"A fact is material if a reasonably prudent person under the circumstances would attach importance to it in determining his course of action."

Plaintiff does not contend that this instruction is an incorrect statement of the law, but only that it was unnecessary to instruct the jury on the meaning of the term material because that term was used in its usual and conventional sense. We disagree that the instruction was unnecessary. The term "material fact," as it is used as an element of an action for fraud, involves the kind of objective standard included in the requested instruction. *See Milliken v. Green*, 283 Or 283, 583 P2d 548 (1978). The dictionary definition of "material," "being of real importance or great consequence," Webster's Third International Dictionary, does not contain that objective element.

Defendants were entitled to have the jury instructed on the definition of the term which constitutes an element of the action against which they were defending.

■ Defendants also contend that the trial court erred in failing to instruct the jury that "fraud is never presumed." Within the context of the instructions as a whole, see *Yardley v. Rucker Brothers Trucking, Inc., supra,* we believe the jury was adequately instructed in that regard, and the failure to give the instruction was not error.

■ Defendants assign error to the failure to give their requested instructions containing the specific language of the First and Fourteenth Amendments to the United States Constitution and Article I, Sections 2 and 3 of the Oregon Constitution.[29] The refusal to give such instructions was not error. The language of the constitutional provisions is not by itself a statement of the law which was necessary or even particularly helpful to the jury in resolving the issues in this case. Although it might not have been error to give such an instruction, neither was it error to refuse to do so.

■ Finally, defendants assign error to the refusal to give the following instruction:

"The parties have stipulated that Scientology is a religion. I instruct you that for all purposes in this case Scientology is a religion and the Church of Scientology, Mission of Davis, and Church of Scientology of Portland are religious institutions."

---

[29] Defendants' requested instructions were as follows:

"The First Amendment to the United States Constitution provides that: 'Congress shall make no law respecting the establishment of religion or prohibiting the free exercise thereof.'

"The Fourteenth Amendment to the United States Constitution provides that: '* * * No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property, without due process of law; nor deny any person within its jurisdiction equal protection of the laws.'

"Article I, Section 2 of the Oregon Constitution provides under Freedom of Worship: 'All men shall be secure in the natural right, to worship Almighty God according to the dictates of their own consciences.'

"Article I, Section 3 of the Oregon Constitution under Freedom of Religious Opinion provides: 'No law shall in any case whatever, control the free exercise, and enjoyment of religious opinions, or interfere with the rights of conscience.'"

The first portion of their requested instruction is not correct. Plaintiff did not stipulate that Scientology is a religion. She chose to approach the problems presented in this litigation on the basis that it did not matter whether Scientology is a religion, because the defendants could be liable in any event. That does not amount to a stipulation that Scientology is a religion. However, we have determined that the record in this case establishes, as a matter of law, that Scientology is a religion. The jury should have been so informed.

## PUNITIVE DAMAGES

The final assignment of error we consider[30] is the failure of the trial court, on motion by defendants, to withdraw from the jury the claim for punitive damages. In the trial court and in this court defendants rely on *Wheeler v. Green,* 286 Or 99, 593 P2d 777 (1979), for the proposition that imposition of punitive damages is constitutionally impermissible in the context of free speech.[31] Defendants contend that that proposition also applies to the area of free exercise of religion and that statements arguably religious should not subject one to liability for punitive damages because of the "chilling effect" such awards could have on the practice of religion. They make only constitutional arguments and do not argue that the case is otherwise inappropriate for an award of punitive damages.

---

[30] Defendants' other assignments of error are either mooted by our disposition of the issues we have discussed, were not preserved in the trial court, or are, in our estimation, unlikely to arise again on re-trial.

[31] *Wheeler v. Green, supra,* is based on the Oregon Constitution. Defendants also rely on *Gertz v. Robert Welch, Inc.,* 418 US 323, 94 S Ct 2997, 41 L Ed 2d 789 (1974), for the proposition that punitive damages are constitutionally impermissible for defamation. *Gertz,* however, does not hold that punitive damages may never be awarded for defamation. The Court was concerned with the self-censorship of media defendants which might result from the possibility of punitive damage awards under state laws requiring less than a showing of actual malice. The Court stated:

> "We also find no justification for allowing awards of punitive damages against publishers and broadcasters held liable under state-defined standards of liability for defamation. * * * In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated by New York Times [*Co. v. Sullivan,* 376 US 254, 84 S Ct 710, 11 L Ed 2d 686, 95 ALR2d 1412 (1964), that is 'actual malice'] may recover only such damages as are sufficient to compensate him for actual injury." 418 US at 350.

After the briefs in this case were submitted, the Oregon Supreme Court decided *Hall v. May Department Stores Co., supra,* in which it held that punitive damages are not available in an action for outrageous conduct in which the only conduct which subjects the defendant to liability is "speech." The court stated:

"When the cause of defendant's liability is his 'abuse' of speech and expression, as in the case of defamation, *Wheeler v. Green* holds that the 'responsibility for the abuse' is confined to civil liability for compensation only. Here the injury was to plaintiff's person rather than her reputation, but as long as it resulted from an 'abuse' of speech only, the principle is the same." 292 Or at 146.

It might well be argued on the basis of the above language that any fraud which involves an abuse of speech or expression is similarly exempt from the imposition of punitive damages. The Supreme Court has, however, recognized the possibility of an award of punitive damages in cases involving fraud in several recent opinions. *See, e.g., Schmidt v. Pine Tree Land Dev.,* 291 Or 462, 631 P2d 1373 (1981); *Milliken v. Green, supra; Green v. Uncle Don's Mobile City,* 279 Or 425, 568 P2d 1375 (1977). Although we are not certain just what the analytical distinction is, given the broad language in *Hall,* we do not believe that the Supreme Court intended to prohibit the award of punitive damages in all cases of fraud, and we decline to do so here.

Defendants, arguing without "benefit" of *Hall,* do not claim that all fraud is exempt from the imposition of punitive damages, but that "* * * in the sensitive area of First Amendment freedoms, a plaintiff can recover only compensatory damages." They contend that the imposition of punitive damages would have a chilling effect, not only on the exercise of free speech and association, but on the free exercise of religion as well.

As we have stated, we do not agree that punitive damages are unavailable for fraud merely because the fraudulent representations are "speech." Defendants suggest that because the actions giving rise to this cause of action occurred in the context of a religious organization of which plaintiff was a member, the free exercise of religion would be chilled by the possibility of a punitive damage award. We do not believe that such a chilling effect is a threat

to the free exercise of religion. In order to be actionable at all, the statements alleged must be found to have been *non-religious* as made. Defendants' argument seems to lead to is the conclusion that religious organizations should not be made liable for punitive damages because they are religious organizations, even if the content of the statements which they are alleged to have made is not religious. We find no constitutional requirement for such an exemption. The free exercise of religion is sufficiently protected by the the broad scope of what *is* protected as religious belief and practice and the fact that the truth or falsity of such religious beliefs may not be determined in an action for fraud. The trial court properly denied defendants' motion to strike the claim for punitive damages.

Reversed as to defendants Church of Scientology of Portland and Delphian Foundation; reversed and remanded for a new trial as to defendants Samuels and Church of Scientology, Mission of Davis.