Jimmie D. POINDEXTER

v.

Theron Wayne ARMSTRONG and
The Jasher Company.

Civil No. 93–2028.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

Dec. 19, 1994.

Eddie N. Christian, Matthew T. Horan, Ft. Smith, AR, for plaintiff.

Bradley D. Jesson, Hardin, Dawson & Terry, Fort Smith, AR, Harry Scoufos, Jim Jones, Sallisaw, OK, for defendants.

## ORDER

HENDREN, District Judge.

NOW on this 19 day of December, 1994, comes on for consideration defendants' Motion for Judgment as a Matter of Law, and the Court, being well and sufficiently advised, finds and Orders as follows:

1. Plaintiff, Jimmie D. Poindexter, brought suit against defendant, Theron Wayne Armstrong (Armstrong) and The Jasher Company (Jasher) claiming, *inter*

*alia,* that the actions of Armstrong toward and about plaintiff, in connection with a certain bible study group Armstrong led and plaintiff attended, amounted to the tort of outrage and that such actions were properly chargeable to Jasher by reason of Armstrong's alleged relationship to the said corporation.

2. Trial was held in this matter before a jury composed of eight persons, commencing Monday, August 15, 1994, and concluding Friday, August 26, 1994, at which time the jury returned a verdict in favor of plaintiff against both Armstrong and Jasher, jointly and severally, in the amount of $15,000 for compensatory damages and $125,000 in the amount of punitive damages. Pursuant to that jury verdict, the Court entered its judgment on August 31, 1994.

3. In their motion, defendants say that the jury verdict and resulting judgment should be set aside by the Court and that the Court should enter judgment in favor of both defendants, as a matter of law, since, say defendants, (1) the evidence adduced at trial is not sufficient, as a matter of law, to support the verdict and judgment; and (2) the Court, in fact, had no proper jurisdiction over both of the defendants.

4. In response to defendants' motion, plaintiff says the evidence presented at trial is sufficient, as a matter of law, to show defendant Armstrong is guilty of the tort of outrage and that his conduct is properly attributable to the corporate defendant, Jasher. Plaintiff further says the Court properly has jurisdiction in the matter since Armstrong's activities began in Arkansas when he engineered two of the separations of plaintiff and his former wife, Loretta Poindexter (Loretta), and that the substantial portion of the acts constituting the alleged tort of outrage occurred in the Western District of Arkansas, thereby justifying exercise of this Court's jurisdiction over defendants in the matter.

5. First, with respect to defendants' challenge to this Court's personal jurisdiction over them, the Court believes such challenge is without merit since the majority of the acts alleged by plaintiff occurred within the West-

ern District of Arkansas. This is unquestionably the case with respect to Armstrong' actions and, in the Court's view, is decidedly the case with respect to the "actions" of Jasher insofar as those of Armstrong are properly attributable to it. Accordingly, the motion is not well-taken on that score.

■ 6. The standard for considering a motion for judgment as a matter of law is set forth in *White v. Pence,* 961 F.2d 776 (8th Cir.1992), as follows:

The question is a legal one, whether there is sufficient evidence to support a jury verdict. This court must analyze the evidence in the light most favorable to the prevailing party and not engage in a weighing or evaluation of the evidence or consider questions of credibility. (citations omitted). We have also stated that to sustain a motion for JNOV, all the evidence must point one way and be susceptible of no reasonable inference sustaining the position of the non-moving party. (citations omitted).

*Id.* at 779.

■ 7. Before addressing the substance of defendants' motion, it is necessary to examine Arkansas law with respect to the tort of outrage since in this diversity action, this Court, sitting in the Western District of Arkansas, is obliged to follow the substantive law of the forum. *B.B. v. Continental Ins. Co.,* 8 F.3d 1288, 1291 (8th Cir.1993).

■ In Arkansas, the tort of outrage was first recognized as such in the 1980 case of *M.B.M. Co., Inc. v. Counce,* 268 Ark. 269, 596 S.W.2d 681 (1980). That decision, hereinafter referred to as *M.B.M. Co., Inc.,* came about when, on certiorari, the Arkansas Supreme Court reviewed the affirmance by the Arkansas Court of Appeals of a lower court decision. In the Court of Appeals case, *Counce v. M.B.M. Co., Inc.,* 266 Ark. 1064, 597 S.W.2d 92 (Ark.App.1980) (hereinafter referred to as *Counce* ), Chief Judge Ernie Wright concluded that a claim based upon infliction of emotional distress could be brought in the Arkansas courts and quoted, with approval, from the Massachusetts Supreme Court case of *Agis v. Howard Johnson Co.,* 371 Mass. 140, 355 N.E.2d 315 (1976)

the rule as to what a plaintiff must prove to establish such a claim. Chief Wright noted that the Massachusetts court had relied on Restatement (Second) of Torts § 46 and decisions from several other states as support for their rule and said that the rule was approved for Arkansas. The rule reads as follows:

One who, by extreme and outrageous conduct and without privilege, causes severe emotional distress to another is subject to liability for such emotional distress, even though no bodily harm may result. However, in order for a plaintiff to prevail in a case for liability under this tort, four elements must be established. It must be shown (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was "extreme and outrageous," was "beyond all possible bounds of decency" and was "utterly intolerable in a civilized community"; (3) that the actions of the defendant were the cause of plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was "severe" and of a nature "that no reasonable man could be expected to endure it."

*Counce,* 266 Ark. at 1068, 597 S.W.2d at 94.

On certiorari, the Arkansas Supreme Court affirmed *Counce* by its opinion in *M.B.M. Co., Inc.* saying it found no error in the Court of Appeals' holding. There, in a typically thorough and well reasoned opinion, then Chief Justice John A. Fogleman reviewed the history of claims for emotional distress in the State of Arkansas, and pointed out that the Court had in the past strained to find a constructive physical injury before it would sustain an award for emotional or mental distress or mental suffering. Relying on the teachings of Prof. Prosser in Prosser, Insult & Outrage, 44 Cal.L.Rev. 40 (1956) and the Restatement of Law, Torts 2d, § 46, p. 71 et. seq., Chief Fogleman stated:

We need only to abandon our strained efforts to find a tort or a theoretical physical impact or injury and the consequent tenuous reasoning in order to justify the award of damages for mental anguish. By doing so, *we can and do now recognize*

*that one who by extreme and outrageous conduct wilfully or wantonly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress.* (Emphasis added).

*M.B.M. Co., Inc.,* 268 Ark. at 279–280, 596 S.W.2d at 687.

The full text of Restatement of Law, Torts 2d, § 46, as it appears at pages 71–72, is as follows:

§ 46. Outrageous Conduct Causing Severe Emotional Distress

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

> (a) to a member of such persons's immediate family who is present at the time, whether or not such distress results in bodily harm, or
>
> (b) to any other person who is present at the time, if such distress results in bodily harm.

Chief Fogleman's language in *M.B.M. Co., Inc.* is virtually identical to Section (1) of § 46 of the Restatement. Moreover, in fleshing out the import of the holding recognizing a claim based on intentional infliction of emotional distress (also called the tort of outrage), Chief Fogleman referred to comments j and d to said § 46, as follows:

> The emotional distress for which damages may be sought must be so severe that no reasonable person could be expected to endure it. It must be reasonable and justified under the circumstances. Liability arises only when the distress is extreme. Restatement, Torts 2d 78, § 46, Comment j.
>
> By extreme and outrageous conduct, we mean conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utter-

ly intolerable in a civilized society. See Restatement of the Law, Torts, 2d 72, § 46, Comment d.

*M.B.M. Co., Inc.,* 268 Ark. at 280, 596 S.W.2d at 687.

Further, citing Comment g to said § 46, Chief Fogleman indicated that one is not liable for doing that which one has a legal right to do. *Id.*

A review of said comments d (*Extreme and outrageous conduct*), j (*Severe emotional distress*), and g (*Privilege or exercise of legal right*) to § 46 shows that Chief Fogleman essentially adopted the reasoning in the comments in his effort to define what does or does not constitute the tort of outrage in Arkansas.

It is noteworthy, in the Court's view, that Chief Fogleman did *not* incorporate into the *M.B.M. Co., Inc.,* opinion any reference to Section (2) of said § 46 which deals with conduct directed to a third person. Likewise, he did not refer to comment 1 under § 46 which is titled (and relates to) *Conduct directed at a third person.* Since, in *M.B.M. Co., Inc.,* there was no claim advanced by plaintiff by reason of any alleged outrageous conduct toward a third person, there was no reason for Chief Fogleman to address that aspect of the tort of outrage as discussed in § 46. It thus appears that the Arkansas Supreme Court did not, in *M.B.M. Co., Inc.,* fully embrace § 46 of the Restatement of Torts with respect to the tort of outrage.

A review of cases cited by both parties in their briefs—as well as those discovered by the Court in its own research—fails to disclose any subsequent case after *M.B.M. Co., Inc.,* in which the Arkansas courts have extended their recognition of the tort of outrage to conduct of third persons as contemplated by section (2) of § 46. Instead, although the Eighth Circuit, in a case decided only one year after *M.B.M. Co., Inc.,* expressed its opinion that "it is probable that the Arkansas Supreme Court would adopt it [section (2)] in an appropriate case," *Orlando v. Alamo,* 646 F.2d 1288, 1291, n. 5. (8th Cir.1981), the Arkansas Supreme Court subsequently declined to do so when presented with the opportunity in

1989. In *Deason v. Farmers & Merchants Bank of Rogers,* 299 Ark. 167, 771 S.W.2d 749 (1989), a widower and children of a deceased mortgagor sued a mortgagee and a listing agent for, *inter alia,* inflicting outrage (as to and on them) by allegedly improperly forcing payment of interest on a note when the mortgagor (and maker of the note) was dying of cancer. In affirming the trial court's dismissal of the tort of outrage claims of the widower (J.W.) and the children (Jack and Virginia), the Arkansas Supreme Court stated:

> Jack, J.W., and Virginia assert that the restatement section cited above [Restatement (Second) of Torts § 46 (1965)] permits a cause of action to an immediate family member without necessity of bodily harm where the actions of the alleged tortfeasor are directed at a third person, in this case their wife and mother. The restatement section supports their assertion that they have standing to sue; however, *we have not adopted the language referring to conduct toward third persons contained in the section.* (Bracketed material and emphasis added).

*Id.,* 299 Ark. at 173, 771 S.W.2d at 753.

Although in *Deason,* the court went on to observe that the conduct of the defendants, as shown by the facts of the case, "falls far short of extreme and outrageous behavior which is utterly intolerable in a civilized community" and therefore, plaintiffs' cause would have failed in any event, it seems clear that the court, when faced with the opportunity to extend its recognition of the tort of outrage to situations involving conduct of a third party, declined to do so.

■ It therefore appears that the tort of outrage, as adopted and recognized in Arkansas at the present time includes only conduct directed to the person bringing the action. Accordingly, evidence concerning the conduct of Armstrong toward third persons may not properly support plaintiff's claim for the tort of outrage unless this Court should be convinced that Arkansas courts, if and when faced with the instant set of facts, would decide to extend its recognition of the tort of outrage to cover conduct toward a third person. Where the state courts have not passed

on the issue, it is left to a federal district court applying the law of that state to make its best guess or prediction as to what the state court *would* or *will* do if and when it considers the issue. *Jackson v. Anchor Packing Co.,* 994 F.2d 1295, 1301 (8th Cir. 1993).

In this court's view, the Arkansas Supreme Court has clearly been hesitant to expand or extend the tort of outrage. Several cases decided after *M.B.M. Co., Inc.* emphasize that the Arkansas Supreme Court takes a narrow view of claims for the tort of outrage. *Deitsch v. Tillery,* 309 Ark. 401, 406, 833 S.W.2d 760, 762 (1992) and that it addresses outrage in a cautious manner. *Dillard Dept. Stores, Inc. v. Adams,* 315 Ark. 303, 305, 867 S.W.2d 442, 443 (1993).

As has been noted above, the 1981 prediction of the Eighth Circuit Court of Appeals in *Orlando,* that the Arkansas Courts would extend the tort of outrage to cover conduct of third persons was apparently mistaken since in 1989, the Arkansas Supreme Court declined to do so in *Deason.*

Based on its review of the Arkansas cases, it is now this Court's view and prediction that the Arkansas Supreme Court would *not* recognize conduct toward a third party as constituting an actionable tort of outrage when faced with the same facts as in this case. *See Deason.* It follows, therefore, that in ruling on defendants' motion, the Court must examine only that evidence which tends to establish conduct of Armstrong toward plaintiff, himself, as being outrageous and atrocious to the extent of amounting to the tort of outrage as made actionable in the state of Arkansas. That evidence must, for purposes of this motion for judgment as a matter of law, be considered in the light most favorable to plaintiff and the Court may not weigh or evaluate the evidence or the credibility of the witnesses. In order to properly grant the motion, the evidence must point only one way and not be susceptible to any reasonable inference sustaining plaintiff's position. *White v. Pence,* 961 F.2d at 779.

8. In order to establish the tort of outrage in Arkansas, the following four (4) elements must be established:

(1) That the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct;

(2) That the conduct was "extreme and outrageous," was "beyond all possible bounds of decency" and was "utterly intolerable in a civilized community";

(3) That the actions of the defendant were the cause of the plaintiff's distress; and

(4) That the emotional distress sustained by the plaintiff was so severe that no reasonable man could be expected to endure it.

These necessary elements have been reaffirmed and followed by the Arkansas Supreme Court in many cases decided after *M.B.M. Co., Inc.. See, e.g., Deitsch v. Tillery,* 309 Ark. 401, 833 S.W.2d 760 (1992) and *Ross v. Patterson,* 307 Ark. 68, 817 S.W.2d 418 (1991).

In expressing that narrow view of the tort of outrage in *Sterling Drug, Inc. v. Oxford,* 294 Ark. 239, 743 S.W.2d 380 (1988), the Arkansas Supreme Court said one is subject to liability for outrage if he or she willfully or wantonly causes severe emotional distress to another by extreme and outrageous conduct—conduct that is so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society. The Court has further said that emotional distress for which damages may be sought must be so severe that no reasonable person could be expected to endure it. *Tandy Corp. v. Bone,* 283 Ark. 399, 678 S.W.2d 312 (1984). The tort of outrage is not easily established and requires clear-cut proof—merely describing conduct as outrageous does not necessarily make it so. *Givens v. Hixson,* 275 Ark. 370, 631 S.W.2d 263 (1982).

In *Sterling Drug,* the Arkansas Supreme Court found that where a corporate employer suspected that an employee had reported it to the General Services Administration for pricing violations, and had entered on an 18–month campaign to force the employee to resign even though agents of the employer knew that the employee was under pressure because of a recent divorce, the employer's conduct did not rise to a sufficient level to support a verdict for outrage. In so holding, the Court said:

> The recognition of the tort of outrage does not open the doors of the courts to every slight insult or indignity one must endure in life.

*Id.,* 294 Ark. at 244, 743 S.W.2d at 383.

This language is reminiscent of the language of comment d to § 46 of Restatement (Second) Torts, which Chief Fogleman cited with approval in *M.B.M. Co., Inc.:*

> The liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

Restatement (Second) Torts § 46, comment d (second paragraph).

Armed with the foregoing understanding of Arkansas law on the tort of outrage, the Court now turns to a review of plaintiff's complaint and the evidence offered by plaintiff in support thereof.

9. In Count II of plaintiff's complaint, wherein he seeks to recover based upon the tort of outrage, he alleged, *inter alia:*

(a) that Armstrong, for many years, tried to get Loretta and others to turn money over to him in the form of cash and that, for many years, Loretta had turned over to Armstrong a significant percentage of her income. Complaint, para. 8.

(b) that Armstrong, assisted by others and Jasher who acted under his direction and control, intentionally used the following techniques involving undue influence, deceit and fraud in order to get Loretta to turn her considerable financial assets over to him:

(1) that, in March and April, 1991, Armstrong withheld his services from the religious group he headed and accused Loretta "and another selected individual" of being at fault, thus wrongfully causing Loretta and other members of the group to feel as if Loretta "was guilty"—that Armstrong returned to the group only after he received cash for a new car; Complaint, para. 9(a).

(2) that in June and July, 1991, Armstrong utilized group isolation or "shunning," social deprivation, and public disparagement to induce Loretta (and others) to agree to a Jasher business venture; Complaint, para. 9(b).

(3) that in August and September, 1991, Armstrong publicly ridiculed and humiliated Loretta for spending money on books, a piano, art, sewing lessons, birth giving preparation classes and maintenance of a riding horse; Complaint, para. 9(c).

(4) that in mid-September, 1991—at a time when plaintiff and Loretta were about to purchase a home—Armstrong caused Loretta, then eight months pregnant, "to be removed from the marital abode and subjected to psychological and emotional indoctrination and programming until she abandoned the idea of purchasing a home"; Complaint, para. 9(d).

(5) that in January, 1992—some two months after the birth of Hanna (daughter of plaintiff and Loretta)—Armstrong again caused Loretta "to be removed from the marital abode and again subjected to psychological and emotional indoctrination and programming until she agreed to stop leasing the marital abode in this judicial district, to move to a remote location in Muldrow, Oklahoma, and to 'lay all her wealth at his (Mr. Armstrong's) feet' "; Complaint, para. 9(e).

(6) that, although Loretta complied with his directives, Armstrong refused to permit her and Hanna to return to the marital abode in this judicial district (and, therefore) plaintiff "had to move the family out of their home and rent a small accommodation in Muldrow, Oklahoma. Only then were Mrs. Poindexter (Loretta) and Hanna released"; Complaint, para. 9(f).

(7) that in 1992, Armstrong induced Loretta and others to work for Jasher without compensation and threatened to again cause Loretta to be removed from the marital abode unless and until plaintiff quit his gainful employment with the U.S. Postal Service and went to work for Armstrong's Jasher business venture and that, "Mr. Poindexter (plaintiff) did both in an attempt to preserve his marriage." Complaint, para. 9(g).

(8) that in the latter part of 1992, Armstrong publicly accused Loretta of "not keeping her vow" (the vow to lay all of her wealth at Mr. Armstrong's feet) and again caused Loretta to be removed from the marital abode and subjected to more psychological and emotional indoctrination and programming until she turned over all of her wealth to Armstrong; Complaint, para. 9(i).

(9) that since November 12, 1992, Armstrong has caused Loretta and Hanna to refuse to live with plaintiff and, instead, to live with Ole and L. Victoria Raff in this judicial district; Complaint, para. 9(i).

(10) that Armstrong caused Loretta to file divorce proceedings against plaintiff; Complaint, para. 9(i).

(11) that Armstrong and others acting at his direction and under his control "have wrongfully, tortuously, and without privilege, interfered with the privacy, parental and familial rights of Plaintiff, and/or have conspired and aided and abetted in an actionable manner concerning such interference, and have engaged in an ongoing pattern and practice of extreme and outrageous conduct that they knew or should have known would cause damage to the Plaintiff; Complaint, para. 14.

(12) that Armstrong and others acting at his direction and under his control have engaged in the "deliberate and wrongful manipulation of fears, insecurities and other emotions; public humiliation and disparagement; group isolation and social deprivation; physical deprivation and abuse (including physical beatings of Mrs. Poindexter and Hanna Poindexter); and other means and methods of physical, psychological and emotional indoctrination and programming." Complaint, para. 14.

(13) that, as a result of Armstrong's alleged wrongful conduct, plaintiff's "marriage

has been severely damaged and possibly destroyed and he has been deprived of the ability and right to live with or meaningfully communicate with his wife and infant daughter or otherwise enjoy and share with his wife and infant daughter the pleasures, love, affection and benefits of marriage and parenthood." Complaint, para. 15.

10. The proof offered by plaintiff included the testimony of several witnesses and the introduction of documentary and other evidence.

(a) Plaintiff testified on the 5th, 6th and 7th days of trial.

On Direct Examination, plaintiff stated he first met Armstrong in approximately July or August of 1988, and started going to Armstrong's bible study in 1989, where he met Loretta. He started dating Loretta at bible study which they attended together. They dated almost every night and spent most of their dating time with Armstrong and other members of the bible study group. Before he and Loretta married, he heard Armstrong tell Loretta she had to get out from under the influence of her parents. Also before the marriage, Armstrong told him he (plaintiff) also had to get away from his parents with whom he then lived.

Plaintiff acknowledged that he had committed adultery with a woman named Linda about thirty days after he had married Loretta in early 1989. He told Armstrong, in confidence, about his adultery in approximately July of 1991, and he confessed it to Loretta in August of 1991. He felt that Armstrong held the adultery over him in order to keep him in line.

Armstrong insisted that plaintiff be counselled because he wouldn't conform and because his "beast was up." Plaintiff and Loretta had to go through numerous counselling sessions—if he wasn't in trouble, she was and vice versa. Armstrong urged him and Loretta to buy some acreage and let Armstrong build a home on the edge of it. They declined.

Plaintiff said Armstrong wanted Loretta to put up some money to start a business which would build saw mills, build houses for members and make jobs for all. Plaintiff told him it was up to Loretta but if it had been up to plaintiff he was not in favor of it.

Armstrong criticized Loretta because she had a "bad attitude"; because she was a yankee; because she had a "money attitude"; because she had education; because she took Lamaze classes; because she was lazy and had a housekeeper; because she liked books; because she had an inordinate affection for her horse and spent money on it; and because she charged a member to give piano lessons to the member's child.

Both plaintiff and Loretta were "in trouble" by September or October of 1991, because they were not "of one mind with the group." Shortly before the birth of Hanna Poindexter (daughter of Plaintiff and Loretta, hereinafter called "Hanna"), plaintiff was allowed to sit with Loretta at meetings but was not allowed to talk to her. He was ordered to receive counselling but didn't know why.

Armstrong criticized plaintiff and Loretta for having Loretta sit in the back seat of a car with the child while plaintiff drove.

At a meeting on or about January 4, 1992, plaintiff was asked to leave because Armstrong left and said he wouldn't be back until "the inequity is off the porch"—referring to plaintiff. Plaintiff was not physically thrown out of the meeting, but it was made plain that he was to leave. Loretta and Hanna stayed at the meeting after he'd been asked to leave. He didn't see them again for about ten days. Armstrong and the others refused to tell him where Loretta and his child were and told him she didn't want to see or talk to him. Armstrong and the others made it plain to him that if he wanted his wife and baby back, he would have to conform and move out from under the dark cloud he was under.

Armstrong told him that Loretta was going to "do" Jasher since God wanted her to do so. Plaintiff said he would agree even though he didn't know what Jasher was.

Armstrong discouraged Jimmie and Nadine George from repaying a $7,000 debt due Loretta, and Armstrong influenced Loretta to contribute one of her dividends from her parent's company to the Jasher company.

Armstrong "intimidated" plaintiff in front of the bible study group and caused him to quit the post office and to go to work for Jasher. Armstrong ridiculed him by saying, "What do you think of a guy who'd rather work for Moab rather than Jasher?" This happened and he left the post office in July of 1992. He was afraid he'd be separated from wife and child if he didn't quit the post office and go to work for Jasher. He was rarely paid to work for Jasher although he got one or two checks.

Loretta spanked Hanna a lot at the urging of Armstrong and, in October of 1992, Loretta told plaintiff that while she was cleaning house for Donna Parker, Parker had beaten Loretta with a belt because she said Loretta wasn't working well. Loretta said Parker beat her two different times—until Loretta said "Thank you" and then "I Love You"—after which they then hugged.

When plaintiff objected to the whipping of Loretta, Armstrong and the others showered love and affection on Loretta, but shunned plaintiff. Plaintiff told Armstrong he couldn't be of one mind on the whipping of adults, and Armstrong told him to do what he felt like he had to do.

Loretta left him while he was out of town and went to her sister's place. They subsequently divorced.

On cross examination, plaintiff stated that no one forced or coerced him to join Armstrong's bible study group. He didn't want to quit the post office and work for Armstrong and Jasher but did so because Armstrong told him to and because he then believed Armstrong was the apostle and that he should do all that Armstrong said.

Plaintiff said that, although he came to Armstrong and his meetings voluntarily, he couldn't leave when he didn't like the teachings because he was under "mind control." He said that Armstrong's indoctrination methods puts fear in you; numbs you; makes you afraid God would kill you; makes you believe that if you are disobedient to Armstrong, you are being disobedient to God; and, in plaintiff's case, caused him to be unable to focus or concentrate.

Plaintiff could not point to anything hurtful done to him by Armstrong or at his direction during 1988 or during 1989. He said that in 1990, Armstrong caused him to become obligated for an apartment and he had not asked Armstrong for any aid in getting an apartment. Otherwise, he could not point to anything hurtful done to him by Armstrong or at his direction during 1990.

Plaintiff said that, in 1992, because of Armstrong's directions and/or influence, he could not see his wife and child for some forty days.

Plaintiff said he did not voluntarily get involved with "the cult" and that, because he was under the influence of "mind control" when he quit the post office, he may not be able to get that job back. He stated that neither Armstrong nor anyone else connected with him ever did plaintiff any physical injury, nor did they ever physically restrain him or prevent him from going wherever he wanted to go. He said he was discharged from the group since he was not of the same mind, judgment and unity with the group. He was not of the same mind, he says, because he could not agree with the spanking of Loretta and the spanking of the child.

Plaintiff said he was not present and did not see the spanking of Loretta and that all he knows about it is what Loretta told him. He said that both he and Loretta spanked their child.

Plaintiff said that, other than what he has testified to, he can't think of any specific instances where Armstrong or others acting pursuant to his directions did things hurtful to him.

(b) Plaintiff called as fact witnesses Kathryn Whittaker Avery, Ann Kremers, and Leo Kremers—all of whom had been former members of Armstrong's group, but who had been made to leave. Their testimonies essentially supported plaintiff's allegations about Armstrong's teachings and his attempts to induce Loretta to turn over her wealth to him and the group. They specifically confirmed that Armstrong's methods were verbal and that no physical restraints were imposed on them or anyone else in connection with Armstrong and the group.

All indicated that Armstrong worked to induce them to believe that he was God's apostle or messenger and that they should strive to do what he instructed them to do. None indicated that plaintiff had ever been subjected to physical abuse at the hands of Armstrong or anyone acting at his direction or under his control but, rather, indicated that Armstrong's actions toward plaintiff and his wife, Loretta, involved only preaching, advising and counselling as to what Armstrong believed the bible and right thinking required for them—especially Loretta.

(c) Plaintiff also called a psychiatrist named Dr. Lewis Jolyn West, and a psychologist named Dr. Paul Martin, as expert witnesses.

Dr. West testified he had done considerable work studying cults, and had participated in a study involving former prisoners of war from the Korean Conflict who had allegedly been subjected to "brainwashing" or "mind control" while prisoners of the North Koreans. Dr West testified, *inter alia*, that based on his interviews with plaintiff and other former members of the group; the depositions of both Armstrong and Loretta and others; and his examination of documents in the case as well as certain tapes of Armstrong's sermons to the group; he was of the opinion that Armstrong's bible study group met the accepted criteria used to identify a "totalist cult." He was apparently of the opinion that a person could be subjected to "mind control" or "thought reform" even without the use of physical restraints.

Dr. Martin, a former cult member, testified he has treated ex-cult members since 1987, and is familiar with the criteria properly used to identify cults. Dr. Martin testified, *inter alia*, that, based on his review of some of Armstrong's taped sermons; some reports from private investigators who had interviewed former members of Armstrong's group; some depositions of former members of the group; and interviews with former group members including plaintiff, he was of the opinion that former members exhibited typical symptoms of having been members of a "cult." He was further of the opinion, based on his some ten hours of interviews with plaintiff, that plaintiff's story was consistent with what others said about Armstrong's group and that plaintiff exhibited most of the same symptoms which indicated he had been a member of a "cult." He diagnosed plaintiff as having an adjustment disorder, chronic, even though he had not actually treated him and had not been asked to treat him. Dr. Martin said he was only "somewhat aware" of some of plaintiff's past difficulties including his history of alcohol problems and problems with his military service. He said he could not be sure as to how, if at all, knowledge of plaintiff's background would affect his opinion about plaintiff's condition.

11. Although defendants offered expert testimony of their own which was in disagreement with that of Drs. West and Martin, such may not properly be considered in the context at hand. Moreover, defendants offered the testimony of Loretta and Armstrong which strongly differed with that of plaintiff and his witnesses as to whether Armstrong's group was a cult and whether Armstrong had, by his actions in word and deed, intentionally inflicted emotional distress on plaintiff so as to warrant a finding that he had committed the tort of outrage with respect to plaintiff. Again, in the context of the motion for judgment as a matter of law which is before the Court, such contra testimony may not properly be considered by the Court in deciding the motion.

The Court must review the evidence which is favorable to plaintiff's position and take it as true and established in determining whether a proper case has been made out on the tort of outrage. Accordingly, the Court has not considered any of the contra testimony—either expert or lay—in addressing the motion.

12. It will be noticed that the majority of plaintiff's allegations against Armstrong—as well as the majority of the evidence offered by him at trial—involve conduct toward and about third persons—principally plaintiff's wife, Loretta, and his daughter, Hanna—and that the impact on plaintiff came about because of the effect of said actions on those third persons and their resulting conduct toward plaintiff because of said effect. Given this Court's belief and holding that conduct

toward a third person may not be considered with reference to whether plaintiff has suffered the tort of outrage, the Court will not consider such evidence in evaluating plaintiff's case against these defendants.

■ 13. Looking at plaintiff's evidence in the light most favorable to him, the Court believes it shows that Armstrong encouraged and even cajoled plaintiff into quitting his job at the post office and going to work for Armstrong and Jasher; that Armstrong preached to plaintiff and others that plaintiff should separate himself from his parents and family and make a full and unrestricted commitment to Armstrong and the bible study group; that Armstrong did not keep confidential but, instead, may have used against plaintiff the knowledge that plaintiff had committed adultery soon after his marriage to Loretta; that Armstrong continually insisted that plaintiff be counselled by members of the bible study group because he wouldn't conform and because his "beast was up"; that Armstrong unsuccessfully urged plaintiff and Loretta to buy an acreage and allow Armstrong to build a house on a part of it; that Armstrong criticized plaintiff for not supporting Loretta's decision to put up money for Armstrong's and Jasher's projects; that Armstrong criticized plaintiff because he was not "of one mind with the group"; that Armstrong dictated to plaintiff as to whether he sat with Loretta at bible study meetings and as to whether he was allowed to talk to Loretta at such meetings; that Armstrong indicated to him that if he didn't conform and comply with Armstrong's apparent wishes for Loretta and Hanna to move to Oklahoma, plaintiff would never be able to get his wife and baby back; that Armstrong ridiculed plaintiff in front of the other members of the bible study group; that Armstrong's indoctrination methods put fear in plaintiff, numbed Court and the fact scenarios presented to the Arkansas Supreme Court, wherein the Court found the standard was not met.

In *Ross v. Patterson*, 307 Ark. 68, 817 S.W.2d 418 (1991), the Court reviewed some of its past cases involving the tort of outrage—some of which had not met the *M.B.M Co., Inc.*, standard and some of which had:

In *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 743 S.W.2d 380 (1988), we found that where a corporate employer suspected that an employee had reported it to the General Services Administration for pricing violations, and had entered on an eighteen-month campaign to force the employee to resign even though agents of the employer knew that the employee was under pressure because of a recent divorce, the employer's conduct did not rise to a sufficient level to support a verdict for outrage as recognition of the tort of outrage did not open the doors of the courts to every slight insult or indignity one must endure in life. Likewise, in *Sterling v. Upjohn Healthcare Services, Inc.*, 299 Ark. 278, 772 S.W.2d 329 (1989), we held that where an employee's supervisor had taken a dislike to him and made various attempts to undermine his authority with his employees and to have him fired by falsely accusing him of always being drunk and making untrue statements on his job application, by delaying the processing of his expense vouchers, by having employees watch him and report back to his supervisor, by instructing him not to communicate with other employees, and by cursing him, the conduct did not meet the standard required for the tort of outrage.

In *Neff v. St. Paul Fire & Marine Ins. Co.*, 304 Ark. 18, 799 S.W.2d 795 (1990), we also noted that where the hospital was doing no more than it had a legal right to do—releasing the 17–week–old fetal remains to one of the parents without consulting the other—the conduct, even if improper, would not equate with outrageous conduct necessary for the tort of outrage. *See generally Deason v. Farmers and Merchants Bank*, 299 Ark. 167, 771 S.W.2d 749 (1989); *Bell v. McManus*, 294 Ark. 275, 742 S.W.2d 559 (1988); and *Webb v. HCA Health Servs. of Midwest, Inc.*, 300 Ark. 613, 780 S.W.2d 571 (1989).

*Id.*, 307 Ark. at 70–71, 817 S.W.2d at 420–421.

In contrast, where an employer interrogated an employee, whom it suspected of theft, at thirty minute intervals for most of a day, denied him valium when he was under obvious stress, and threatened him

with arrest, we found that there was substantial evidence to support the jury verdict for outrage and placed special emphasis on the fact that even though the employer knew of the employee's lower than normal emotional stamina, it refused to permit him to take his medication during the interrogation. [*Tandy Corp. v. Bone*, 283 Ark. 399, 678 S.W.2d 312 (1984)].

In *Hess v. Treece*, 286 Ark. 434, 693 S.W.2d 792 (1985), *cert. denied*, 475 U.S. 1036, 106 S.Ct. 1245, 89 L.Ed.2d 354 (1986), Treece, a police officer, sued Hess, the Little Rock City Director, for outrage. Hess, who was angry with Treece over a personal matter, conducted surveillance of Treece, communicated to other individuals that he would have Treece fired at any cost, and apparently made false reports concerning Treece's employment conduct. Basing our decision in part on the fact that Hess's actions continued over a two year time span, we found substantial evidence to support the jury verdict for outrage.

We also found sufficient evidence to support a finding that corporations operating a perpetual care cemetery had committed the tort of outrage where the corporations' agents had repeatedly driven heavy equipment across two gravesites of members of the appellees' family in an attempt to alleviate a drainage problem which the corporations had caused and which could have been solved in other ways, and had continued construction even after the vaults had been exposed and the distress to the appellees had become apparent. *Growth Properties I v. Cannon*, 282 Ark. 472, 669 S.W.2d 447 (1980).

*Id.*, 307 Ark. at 72, 817 S.W.2d at 421.

The Arkansas Supreme Court concluded in *Ross* that although plaintiff's doctor had left town to seek treatment of his personal alcohol and drug abuse problems on the eve of the birth of her child (which died a few hours after delivery) and, therefore, was not with her during the birthing, there was not substantial evidence to satisfy the requirements of the tort of outrage. In so concluding, the Court stated:

While we cannot and do not sanction Dr. Ross's intemperate use of alcohol, drug abuse, and lack of professionalism in not assisting in making final arrangements for Mrs. Patterson's delivery, *there is no clear-cut proof, as we require in all tort of outrage cases,* that his conduct toward Mrs. Patterson was so outrageous in character and so extreme in degree as to rise to the level necessary for the tort of outrage. (Emphasis added.)

*Id.*, 307 Ark. at 73–74, 817 S.W.2d at 422.

In the 1993 case of *Dillard Dept. Stores, Inc. v. Adams*, 315 Ark. 303, 867 S.W.2d 442 (1993), the Arkansas Supreme Court held that while the appellee had been accused of a crime of which she was not convicted and had been questioned in a confrontational manner; photographed and banned from appellant's store; and escorted from the store by police; there was not sufficient evidence to submit the tort of outrage claim to the jury. In so holding, the Court noted that the confrontation lasted less than an hour and that appellee had not been physically touched. In so holding the Court stated:

We do not mean to say that Dillards' employees' actions were merely a "slight insult." We recognize Ms. Adams may well have suffered mental distress as a result of them. She was accused of a crime of which she was not convicted. We cannot, however, find in the facts alleged or shown the kind of "extreme degree" of outrageous conduct "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." Whatever the merits of the claim of Dillards and Ms. Hallmark as to Ms. Adams's conduct (and we assume no merit in them for purposes of this appeal) nothing that was done constituted conduct fitting our definition of "outrage."

*Id.*, 315 Ark. at 306, 867 S.W.2d at 443–444.

Finally, in *Thornton v. Squyres*, 317 Ark. 374, 877 S.W.2d 921 (1994), the Arkansas Supreme Court held that the tort of outrage action is not one that can merely be substituted for a legal malpractice claim which involves inattentive, unprofessional or negligent action of an attorney. The Court observed that "... merely describing such con-

duct as outrageous does not make it so." *Id.,* 317 Ark. at 378, 877 S.W.2d at 923.

No case decided by the Arkansas Supreme Court has been cited or discovered which featured the allegation that "indoctrination programs, religious teachings and tactics" amounted to the tort of outrage. However, in *Orlando v. Alamo,* 646 F.2d 1288 (8th Cir.1981), the Eighth Circuit Court of Appeals affirmed a decision by the U.S. District Court for the Western District of Arkansas which had applied Arkansas law to just such allegations. There, appellants (the parents/family) had alleged that their son had voluntarily left his parents' home and soon after had become attracted to the teachings of appellees (a religious group). For some two years, the son periodically communicated with his family and the family thereby learned that the son, in conformance with the teachings and directives of the religious group—and under their alleged dominating influence—was repudiating his family in a way that caused the family severe emotional distress. In ruling on a motion for summary dismissal filed by the religious group, the district court—while finding that the religious group's conduct may have constituted "a terrible act,"—had concluded as a matter of law that the conduct was not extreme and outrageous. In affirming the decision of the district court, the Eighth Circuit Court of Appeals said:

> Though appellees' alleged indoctrination program, religious teachings and tactics may be viewed with some consternation, we hesitate to characterize them as intolerable in a civilized society.

*Id.* at 1290.

The thinking of the Eighth Circuit Court of Appeals seems to be in line with that of other courts which have considered the tort of outrage in the context of religious teaching and practices. These decisions, discussed below, address the constitutional considerations relating to speech and religious practice which arise in such contexts. For example, it has been held that the practice of "shunning" is a constitutionally protected religious practice. *See Paul v. Watchtower Bible and Tract Soc. of New York,* 819 F.2d 875, 880 (9th Cir.1987), *cert. denied,* 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987); and *Rasmussen v. Bennett,* 228 Mont. 106, 741 P.2d 755 (1987) wherein it was held that church statements condemning plaintiff's conduct and calling for shunning were privileged under the First Amendment. The *Paul* court stated:

> Clearly, the application of tort law to activities of a church or its adherents in the furtherance of their religious belief is an exercise of state power. When the imposition of liability would result in the abridgement of the right to free exercise of religious beliefs, recovery in tort is barred.

*Id.,* 819 F.2d at 880.

In *United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944) the Supreme Court observed:

> The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect. *Watson v. Jones,* 80 U.S. (13 Wall) 679, 728, 20 L.Ed. 666, 676. The First Amendment has a dual aspect. It not only "forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship" but also "safeguards the free exercise of the chosen form of religion." *Cantwell v. Connecticut,* 310 U.S. 296, 303, 84 L.Ed. 1213, 1217, 60 S.Ct. 900, 903. "Thus the Amendment embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." [citation omitted]. Freedom of thought, which includes freedom of religious belief, is basic in a society of free men. [citation omitted]. It embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faith. Heresy trials are foreign to our Constitution. Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others. Yet the fact that they may be beyond the ken of mortals does not mean that they can be made suspect before the law. Many take their gospel from the New Testament. But it would hardly be supposed that they could be tried before a jury

charged with the duty of determining whether those teachings contained false representations. The miracles of the New Testament, the Divinity of Christ, life after death, the power of prayer are deep in the religious convictions of many. If one could be sent to jail because a jury in a hostile environment found those teachings false, little indeed would be left of religious freedom.

*Id.* at 86–87, 64 S.Ct. at 886.

Several lower courts have echoed the teachings of *Ballard.* In *Turner v. Unification Church,* 473 F.Supp. 367 (D.R.I.1978), *aff'd,* 602 F.2d 458 (1st Cir.1979), the Court stated:

> The first amendment absolutely protects the holding of any religious belief, no matter how bizarre or irrational. *Reynolds v. United States,* 98 U.S. 145, 166–67, 25 L.Ed. 244 (1878); *Cantwell v. Connecticut,* 310 U.S. 296, 303–04, 60 S.Ct. 900, [903] 84 L.Ed. 1213 (1940). Likewise, indoctrination and initiation procedures, conditions of membership and the motivation of one who joins a religious group are usually not subject to judicial review. *See United States v. Ballard,* 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944); *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

*Id.* at 371.

In *Van Schaick v. Church of Scientology of Cal., Inc.,* 535 F.Supp. 1125 (D.Mass.1982), the court stated:

> With respect to Count XII, plaintiff alleges only that the Church exhorted her to sever family and marital ties and to depend solely on the Church for emotional support. Neither of these alleged courses of conduct constitutes the kind of extreme and outrageous action which will support a claim for intentional infliction of emotional distress ... [citations omitted]. They are similar to the demands for single-minded loyalty and purpose that have characterized numerous religious, political, military and social movements over the ages.

*Id.* at 1130.

In *Christofferson v. Church of Scientology of Portland,* 57 Or.App. 203, 644 P.2d 577 (1982), *cert. denied,* 459 U.S. 1206 and 459 U.S. 1227, 103 S.Ct. 1196, 1234, 75 L.Ed.2d 439, 468 (1983), the Court of Appeals of Oregon held that the tort of outrage was not applicable to church activities which may be highly questionable to most of society. In *Christofferson,* the Court reversed a judgment for both compensatory and punitive damages in favor of the plaintiff. The first allegedly outrageous act there claimed was a scheme to gain control of plaintiff's mind and to force her into a life of service to the Church of Scientology. In the text of its decision, the *Christofferson* court mentioned several drills and activities utilized by the defendant church in its instruction of plaintiff. The court remarked that few of such activities conducted by the church and its representatives could properly be considered to evenly remotely be connected to the general public understanding of mainstream religious practice. Nevertheless, the Court held, as a matter of law, that the evidence presented by plaintiff failed to establish conduct that is outrageous in the extreme or "beyond the limits of social toleration." *See Christofferson,* 644 P.2d at 590. In so holding, the Court pointed out that there was no evidence that plaintiff was threatened or forced to remain involved in Scientology: "[s]he joined the group voluntarily, albeit, as she claims on the basis of misrepresentations made to her. However, she continued to participate and maintained her involvement for whatever reason without actionable threats or coercion by Defendants." *Id.* at 591.

The plaintiff in *Christofferson* also alleged outrage as a result of what occurred after her "de-programming"—i.e., efforts by the defendant to threaten, humiliate, and intimidate the plaintiff in order to cause her mental distress. The Court held that the conduct was not outrageous.

In *Lewis v. Holy Spirit Ass'n for Unification of World Christianity,* 589 F.Supp. 10 (D.Mass.1983), the plaintiff asserted that he was subjected to brainwashing and indoctrination techniques by the Unification Church, and that as a result, he suffered severe psychiatric disorders. The allegations were not sufficient, however, to withstand a motion to

dismiss. In granting the motion, the court observed that plaintiff voluntarily joined the Unification Church and entered its training program, remaining for fifteen months. The Court said that in order to prove his claim, the plaintiff would be required to establish that the church intended to inflict emotional distress upon him, or knew or should have known that that distress would result to the plaintiff from the church's conduct, and that the conduct was of the extreme and outrageous type that no person could be expected to endure. Finding that plaintiff did not make the required showings, the court granted the motion to dismiss.

A similar conclusion was reached in *Meroni v. Holy Spirit Association for the Unification of World Christianity*, 119 A.D.2d 200, 506 N.Y.S.2d 174 (1986), *appeal dismissed*, 69 N.Y.2d 742, 512 N.Y.S.2d 1028, 504 N.E.2d 698 (1987). There, the plaintiff's son voluntarily joined the training program for membership in the Unification Church. The son committed suicide several months later. Plaintiff alleged that the suicide was a result of the deceptive recruitment and indoctrination program by the church. The plaintiff brought an action against the church for the tort of outrage. In denying the claim, the Court noted that the plaintiff's son had the right to determine for himself whether to associate with the Unification Church and held that neither he nor his parents could recover damages, since he voluntarily chose to subject himself to the church's discipline, which included accepted practices designed to persuade him to adopt the church's religious beliefs. The Court found, as a matter of law, that the complaint failed to allege conduct so outrageous in character, and so extreme in degree, as to constitute a cause of action. The Court also discussed plaintiff's specific allegation that the Unification Church was engaged in "brainwashing." The Court said, with respect to that claim:

> the claim of brainwashing is based upon the activities heretofore described, which, as previously noted, are commonly used by religious and other groups, and are accepted by society as legitimate means of indoctrination. They are not classifiable as so

extreme or outrageous, or offensive to society, as to incur liability therefor.

*Id.*, 506 N.Y.S.2d at 178.

Comparing what plaintiff alleged and proved in this case with what has been seen in other alleged "brainwashing" cases, it is apparent that Armstrong's alleged "brainwashing" practices were far less extreme than in the other cases wherein such practices were not deemed to have amounted to the tort of outrage, but, rather, have been regarded by the courts as permissible religious practices. Several of those cases concluded that such indoctrination practices are insufficient as a matter of law to establish the tort of outrage.

After careful consideration of the cases mentioned above, this Court does not believe that Armstrong's conduct toward plaintiff reaches the standard reasonably required for the tort of outrage as recognized in the state of Arkansas.

For one to teach or espouse to another his belief that he, the teacher, is annointed by some divine being to communicate to such other what the divine being requires of the other, and that failure to heed the teaching could have dire consequences, does not, in the Court's view, amount to conduct which is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society. However much an observer might believe such teachings to be utter nonsense and foolish drivel, the respective rights of the one to so teach and the other to so hear and either believe or not believe are protected by the Bill of Rights to our U.S. Constitution. It is not for the law and courts to determine what may or may not be taught or espoused in the name of religion so long as no citizen is forced to listen against his or her will. That is to say that while every citizen has the right to express his or her views on religion, none has the right to insist that others hear what they have to say.

Here, there is no evidence that Armstrong or anyone acting under his direction or control ever physically forced plaintiff to listen to Armstrong's teachings or to do or not to

do anything. Further, there is no evidence that plaintiff was subjected to any illegal persuasion such as "blackmail," threats, or other non-physical coercion at the hands of Armstrong and/or his group. Plaintiff complains he was subjected to "mind control" which, according to the proof, consisted of nothing more than Armstrong's personal viewpoints and criticisms, religious convictions, forceful rhetoric and largely self-serving "advice"—all of which were regularly expounded in oral sermons, written epistles and lengthy counselling sessions.

There was proof that plaintiff could and did resist Armstrong's views on corporal punishment for wives and children and that he could and did frequently disagree with Armstrong's bald assertions as to what the bible said and what it meant—so much so that Armstrong eventually wanted plaintiff out of the group because he wouldn't conform. These facts suggest that the "mind control" was really just overbearing argumentation by Armstrong which the group found more appealing than that contra to it which was espoused by plaintiff. Accordingly, in the absence of any proof tending to show that plaintiff was personally forced by physical duress or other illegal persuasion to hear what Armstrong had to say about religion, personal conduct or the like, there is no basis for a finding that Armstrong's exercise of his constitutional rights of speech and religious practice amounted to outrageous conduct toward and about plaintiff.

While the Court accepts, as it is required to do in this context, that plaintiff's experts believe (and the jury could believe) that Armstrong's bible study group was a "totalist cult" and that plaintiff showed evidence of having been influenced by such, the actual conduct toward plaintiff by Armstrong and others acting by his direction and under his control simply does not, in the Court's view, reach the level required for the tort of outrage *even if* plaintiff suffered it while being subjected to "mind control." While some might deem it despicable to influence one to quit one's good job in order to follow a religious teaching or belief, others might deem such influencing to be the sacred duty of a teacher in following the dictates of his beliefs relative to spreading the gospel as he sees it.

In the Court's view, the art of persuasion itself involves some degree of "mind control" in the sense that the "persuader" seeks to "convert" his listener to his views and mindset. While such activities may be annoying at times, as long as one has the unfettered right to walk away and not continue to be subjected to the persuader's efforts, it is difficult to see how mere annoyance can rise to the level of outrageous conduct. In the Court's view, it cannot and certainly did not in this case.

15. Finally, even if the Court could properly consider the actions of Armstrong and others toward and about Loretta and plaintiff's child, Hanna, in connection with plaintiff's claim on the tort of outrage, it is the Court's view that plaintiff's complaint in that regard amounts to nothing more than a claim of alienation of affection, a claim which is no longer recognized in Arkansas.

Arkansas has not recognized the claim of alienation of affection by a parent with respect to a child. *Orlando v. Alamo*, 646 F.2d 1288 (8th Cir.1981). Further, although Arkansas did once recognize the claim of alienation of affection by one spouse with respect the other spouse on the basis of loss of consortium, *Id.* at 1289, it was a judicially created action which the Arkansas Legislature abolished by Act 46 of 1989, § 6 (effective November 14, 1989 and now codified as Ark.Code Ann. § 16–118–106). *See Treiber v. Hess*, 301 Ark. 97, 782 S.W.2d 43 (1990). The *Treiber* case was pending when the Arkansas Legislature changed the law and, although Act 46 provided that it was not to apply to litigation pending before its effective date, the Arkansas Supreme Court was asked to, in effect, judicially abolish the action of alienation of affection by dismissing the pending case in which plaintiff had obtained a $100,000.00 judgment. The Court declined to do so and observed that the action of alienation of affection had become an issue of public policy and that, although the court had power to judicially abolish that which had been judicially created, a matter of public policy ordinarily should be decided by

the legislature. The Court elected to follow the legislative enactment.

The latest outrage case by the Arkansas Supreme Court seems to be *Thornton v. Squyres,* 317 Ark. 374, 877 S.W.2d 921 (1994). In *Thornton* the Court observed that the tort of outrage action is not one that can merely be substituted for a legal malpractice action claim. *Id.,* 317 Ark. at 378, 877 S.W.2d at 923. *See also Ross v. Patterson,* 307 Ark. 68, 817 S.W.2d 418 (1991) where the Court suggested that the tort of outrage could not be used as a substitute for a medical malpractice action.

In affirming the lower court, the *Thornton* opinion declared the trial judge to be correct in making the following remarks which the Supreme Court characterized as "insightful":

I think I even announced it to the jury panel today, [that] I thought what we were trying is a legal malpractice action. [Counsel] has chosen not to pursue a legal malpractice action, but, rather, a tort of outrage, a cause of action which has not really been very well developed in the Arkansas court system. This Court is just rather dubious that this is a tort of outrage. To me, this is just a matter of negligence on the part of an attorney. And ... an attorney malpractice action would be the appropriate remedy here.

\*     \*     \*     \*     \*     \*

[I]f this is a tort of outrage, then virtually any act of legal malpractice touching and affecting peoples' lives is also a tort of outrage ... I had an attorney here three months ago who failed to file an answer in time, which resulted in a judgment being entered against his client. There was emotional trauma that would attach under those circumstances. The language that's used in connection with the tort of outrage asks for something more. It's punitive in nature. That's the whole reason the tort of outrage arises, is that any time a person does this we've got to punish them for violating, in almost a penal way, the customs of society.

*Id.,* 317 Ark. at 377–378, 877 S.W.2d at 923.

This Court believes that plaintiff's case to the jury was essentially one for alienation of the affections of both his wife and child and that, to the extent it was such, it is not properly actionable under current Arkansas law. Accordingly, even if this Court should be of the opinion that Arkansas courts would recognize conduct toward third persons as constituting the tort of outrage (and, of course, it is not), plaintiff's case in that regard would still have to fail since it would simply be the recasting of a no longer recognized alienation of affection claim as a tort of outrage. Since Arkansas has abolished the claim of alienation of affection, this Court does not believe her courts would be inclined to judicially reinstate the same in the guise of the tort of outrage.

16. It follows from what has been said that defendants' motion for judgment as a matter of law is good and must be granted.

IT IS THEREFORE ORDERED AND ADJUDGED that defendants' motion for judgment as a matter of law be, and the same hereby is, granted. Accordingly, the jury's verdict and the judgment entered by the Court pursuant thereto are both hereby set aside and judgment is entered in favor of both defendants as to plaintiff's complaint against them, and said complaint is hereby dismissed, with prejudice.